Filed 11/30/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>

THE PEOPLE,

    Plaintiff and Respondent,

v.

MONICA MᶜCARRICK,

    Defendant and Appellant.

</td><td>

A136822

(Solano County
Super. Ct. No. FCR279982)

</td></tr>
</table>

Defendant Monica McCarrick appeals a judgment entered upon a jury verdict finding her guilty of two counts of first degree murder (Pen. Code,[1] § 187), with a multiple-murder special circumstance finding (§ 190.2, subd. (a)(3)), and two counts of assault on a child under the age of eight resulting in death (§ 273ab, subd. (a)). She pleaded both not guilty and not guilty by reason of insanity. In the sanity phase of the trial, the jury found defendant was sane at the time she committed the crimes. The trial court sentenced defendant to two consecutive terms of life without the possibility of parole for the two murders and stayed the sentences for the remaining counts. (§ 654.) On appeal, defendant contends that the evidence does not support the jury's sanity verdict and that the trial court committed instructional error. We shall affirm the judgment.

## I.   BACKGROUND

### A. Guilt Phase

#### 1. *The Crimes and Crime Scene*

On the evening of October 12, 2010, defendant killed her three-year-old twin daughters, Lily and Tori Ball, with a sword. A downstairs neighbor heard loud thumping

---

[1] All statutory references are to the Penal Code.

from defendant's apartment. An hour or two later, a fire alarm went off, and the neighbor saw smoke coming from one of the windows. He ran upstairs and kicked in the front door, but it was blocked, and he was unable to enter. He succeeded in breaking a sliding glass door; when he entered the apartment, he saw a sword on the floor, covered in blood.

Firefighters arrived and found the door to the apartment slightly ajar but difficult to open. They forced the door open, found a fire in a closet near the front door, and extinguished it. They then found the bodies of Lily and Tori close to the door. One of the bodies had been blocking the door. The girls had both suffered severe lacerations, and were dead. The firefighters found defendant in the kitchen and carried her out. She was unconscious and had sustained injuries, including cuts to her throat and wrist.

A search of the apartment revealed an assault rifle and a shotgun in the living room and a box with a loaded handgun and additional live rounds. In the hallway was a straight-bladed sword covered with blood. Near it was a lighter with blood on it. Two high chairs had been overturned in the dining room, with their food trays removed. The high chairs were completely soaked in blood. On a table facing the highchairs was a laptop computer playing an animated children's program. In the kitchen, a landline telephone was on the counter; both the telephone and the countertop were covered in blood. Water was running from the bathroom faucet, and blood was in the sink and on the counter. A cell phone was on the bathroom floor, and on a stool was a novel by James Patterson, Double Cross (2007). The book was about a serial killer, and it was open to a page that contained the words, "My daughter is dead."

2. *The Injuries*

The doctor who performed the autopsies on the two girls testified about their injuries. Tori had 11 cutting wounds to her face, two cutting wounds to her neck, a gaping wound on the front of her neck, nine superficial cutting wounds to her chest, two deep stab wounds on her chest, one of which penetrated her heart and the other her lung, a deep stab wound to her abdomen as well as three small superficial cutting wounds to the abdomen, and wounds on her hands and arms consistent with defensive wounds. Lily had five cutting wounds to her face, four to her neck, and nine to her chest; a large gaping

2

wound to the front of her neck that had severed her larynx and cut the carotid arteries; multiple defensive wounds to her hands and arms; and a six-inch-deep stab wound to her abdomen. Neither girl had inhaled smoke, which meant they were dead before the fire started.

Defendant had multiple injuries and was in critical condition. She had two large lacerations to her throat and multiple cuts and lacerations on her arms and wrists. On one of her arms the tendons that flex the wrist and fingers were severed. She had a large laceration on her upper thigh and large lacerations on each ankle, which cut the Achilles tendons. Tests for alcohol, cocaine, and methamphetamine were negative.

### 3. Observations of Defendant's Fiancé

Defendant and her two daughters lived with defendant's fiancé, Robert Paulson. Defendant and Paulson had known each other about a decade previously and renewed their relationship over Facebook around Thanksgiving of 2009. They became engaged in May 2010, and defendant and her daughters moved to California from Pennsylvania during the last week of August 2010. Paulson's job required large amounts of travel, and on September 9, shortly after the couple moved into their new apartment, he was called away for a month-long assignment in Minnesota. On October 11, Paulson was told he would have to go to Alaska for five to 10 days after the Minnesota assignment ended, rather than returning home. Defendant was upset when Paulson told her about the extension of his trip.

Paulson and defendant spoke on the telephone several times on October 12, the day of the killings. One of the calls took place during the evening, on defendant's cell phone. Defendant was incoherent and "jumbled," and sounded like she was running around the house doing something. Paulson heard defendant "freaking out," and "hysterical noises going on in the background." She told him, "If Tori and Lily are okay tell them that it was an accident." He heard her say, "It's okay. It's going to be okay. We are going to make a fire. We are going to make a fire"; then he heard a fire alarm go off, and then a scream, and then the call ended. He tried to call the apartment several times but got no response.

3

### 4. *Defendant's Recent Behavior*

On the morning of the day of the killings, the assistant manager of the apartment complex where defendant lived asked defendant to move her car because it was blocking other parking spots. At first, defendant would not open her apartment door. Defendant had a hard time telling the assistant manager what she wanted her to do and why the car was parked the way it was. The assistant manager watched the girls while defendant moved the car.

On the morning of the same day, the assistant manager had noticed defendant had a work order to have her locks changed. Defendant later called to ask whether the maintenance department had changed the locks. The girls were crying in the background, and defendant seemed to want the assistant manager to help her with the girls.

Terry Fay, the paternal grandmother of Lily and Tori, lived in southern California. She spoke with defendant often by telephone, and she had cared for the girls on occasion. On October 11, 2010, defendant called Fay and asked, "Who is going to take the girls?" Fay thought defendant needed someone to take care of the girls. Fay told defendant that if she brought the girls to her home, Fay and her family would begin proceedings to have custody of them. Defendant did not sound rational during the conversation. She told Fay that Paulson had had a vendetta against her for 10 years and was kicking her out.

### 5. *Defense Evidence*

#### a. Defendant's Fiancé

Robert Paulson was called as a defense witness. He testified that he had previously had a relationship with a woman named Jill who killed herself with one of Paulson's guns in April 2010, several months after their relationship ended.

While defendant was living in Pennsylvania, she appeared happy and stable. She was working at a dental office and going to school. She was supportive as Paulson coped with Jill's death. When defendant moved to California, she looked for a school so she could get a license to be a dental assistant in the state. Paulson provided money when defendant needed it. Paulson thought defendant was a good mother, and she never did anything to make him think she would harm her daughters.

4

Paulson noticed that defendant changed two or three weeks after he left on his business trip, and in the two and a half weeks before the killings they had a series of communications that led Paulson to believe her behavior was "slowly deteriorating." She found a synopsis for a horror movie Paulson was writing with a friend, which he described as a "slasher" film about a man stalking children on a beach, in which "everyone died." Defendant was upset and thought Paulson had written the story about her and that he might hurt her. She repeatedly brought the subject up during their conversations during Paulson's absence and suggested he had resumed their relationship in order to hurt her. Defendant also questioned Paulson about whether he had driven Jill to suicide, accused him of being with another woman, and said his female friends hated her. She expressed her fear of a UPS delivery man and said he had entered the apartment. At times she said she would not leave the apartment because someone was sitting in a car outside. She thought a Facebook post by a friend of Paulson's, which made a joke about breaking up with a girlfriend using "Dobermans, tasers, and rounds," referred to her. Her mood went "up and down"; Paulson would spend hours reassuring her, she would seem fine, and the next day she would be upset again. She also indicated she wanted help with the children.

When Paulson told defendant he had to go to Alaska for a few days after the Minnesota job, she was upset and they fought. She wanted him to come home and said she missed him. On the evening of the killings, defendant sent him text messages that caused him concern. One, which he said "made no sense," referred to "robot butterflies" and concluded "u will never have me again!" In another, defendant told Paulson to say to the children's father, " 'let the bunnies go forever so we can keep what's ours' and say that defending then [*sic*] is the number 1 most high on your priority list [etc.]. " This was apparently a reference to their hope that Lily and Tori's father might give up his parental rights so Paulson could adopt them. Later in the evening, defendant sent a text message that said, "Tick tock." Another message said, "Read James Patterson." When they spoke on the telephone that evening, defendant "rant[ed]" and ran around. She would hang up, and he would call her back. Paulson described her conversation as "rambling. No

5

coherent thought or trying to get any message across of what was going on." She did not respond to his attempts to communicate with her after the last call ended.

### b. Paulson's Mother

Paulson's mother, Roxanne Paulson, testified that she had helped defendant and the girls move to California from Pennsylvania in August 2010.[2] Roxanne continued to have frequent contact with them after they moved into their apartment in September. Roxanne became concerned because defendant seemed nervous and anxious. A few days before the killings, defendant and the girls spent the night at Roxanne's home. Between 2:00 and 3:00 in the morning, defendant decided to leave. When she took one of the girls to the car, she told Roxanne there was a car outside; she thought someone was watching her. Roxanne reassured her that the person was a neighbor who left for work early. After the girls were in the car, defendant texted Roxanne to ask if it was safe to leave. Once they got home, she texted Roxanne to tell her they were safe. The day before the killings, defendant called Roxanne at work and told her the UPS driver was coming into the apartment. Roxanne testified that defendant was having a hard time managing while Paulson was out of town.

### c. Defendant's Mother

Defendant's mother testified that defendant was managing well before moving from Pennsylvania to California. Defendant began expressing fear of Paulson shortly after she moved. When defendant visited her mother in San Diego from September 29 to October 4, 2010, she brought the synopsis of the horror movie Paulson had worked on and asked her mother what she thought of it and whether it meant Paulson was feeling violent toward her. During the visit, she repeatedly discussed her fears and her uncertainty about getting married. She expressed her concern about the fact that Paulson kept guns in the apartment, but she did not mention the sword. She appeared anxious and

---

[2] To avoid confusion, we shall refer to Paulson's mother as Roxanne. We intend no disrespect.

6

disorganized. Defendant and her mother shopped for a wedding dress; when they did so, defendant did not seem fearful.

On October 11, the day before the killings, defendant called her mother, who told her it was not a good time to talk. She asked if defendant had called about something important, and defendant said, "No, it's okay." She sounded sad and subdued.

### d. Defendant's Friends

Three friends of defendant also testified to her state of mind before the killings. Regina B. testified that defendant sent her a text message on September 25, 2010, saying she was afraid that Paulson and his mother were out to get her, and that Regina B. should let someone know if anything happened to defendant or if she went missing.

Maritza D., a friend from Pennsylvania, testified that she was in regular contact with defendant after the move to California. Within about a week of the move, defendant began to express concern about whether Paulson and his mother would accept her. On September 25, defendant sent Maritza D. text messages saying, "My fiancé Robert Paulson and his mom are acting strange, so f.y.I. [*sic*] if I end up missing or turn up dead or they try to say I committed suicide it is a [] coverup so feel free to get revenge for me." Maritza D. called defendant, who told her that she was afraid Paulson was not going to approve of her and the children, that she was jealous of his relationships over Facebook, and that they were not getting along. She also said she was afraid because of a book Paulson was writing about a murder of a wife or girlfriend. On September 29, defendant sent Maritza D. texts saying, "They want to steal the girls [] And kill me I think[.]" They had further conversations that were "all about the fear"; the last one was about a week before the killings.

Pamela T., defendant's friend who lived in Los Angeles, testified that defendant told her she was afraid Paulson would hurt her or kill her. In a text dated September 25,[3] defendant said "He scares me. I feel like he is going to hurt me. I never meant to hurt

---

[3] Pamela T. testified the date on the text was October 3; however, the copy of the text message in the record indicates it was sent on September 25.

7

him. . . . I need to know I am safe so hopefully this is a paranoid delusion but I'm telling u if I end up missing or turn up dead and or they say I tried to commit suicide it is a coverup." Pamela T. recommended that defendant visit her mother. Later, defendant sent Pamela T. a picture of herself in a wedding dress. In the week or two before the killings, defendant told Pamela T. she was afraid and had arranged a telephone counseling appointment for October 6 to help her deal with the situation. During a conversation within two weeks of the killings, defendant said she had read an obituary of Paulson's former girlfriend and that she thought that rather than dying by suicide, Jill had been killed by Paulson.

### B. Sanity Phase

The parties stipulated that the jury could consider in the sanity phase all evidence that had been presented at the guilt phase. In addition, three mental health professionals who had evaluated defendant testified on her behalf at the sanity phase of the trial. Defendant's theory was that she suffered from delusions that she, Lily, and Tori were going to be kidnapped and held in slavery, and that the only way to save the girls from this fate was to kill them.

#### 1. *John Shields, Ph.D.*

Dr. Shields testified that he had met with defendant nine times between October 2010 and June 2011 and had spent more than 20 hours with her. He administered psychological tests, interviewed defendant's mother, and reviewed other documents, including reports of other interviews, police reports, and mental health records. He opined that defendant suffered from a mental disease, most probably a depressive condition, which had first manifested itself when she was 12 years old when she was hospitalized in 1995 for suicidal ideation and superficial self-inflicted wounds. The records from that incident indicated she had tried to harm herself in the past. At age 14, defendant was diagnosed with a form of attention deficit disorder and received medication. Dr. Shields testified that adolescents with untreated depressive disorders often develop substance abuse problems. Dr. Shields also opined that defendant had

8

bipolar disorder with psychotic features, signs of a delusional disorder, and polysubstance abuse.

Defendant was diagnosed with major depression sometime between 2003 and 2005 while she was living in San Diego and received psychiatric treatment. During that time, she reported experiencing paranoid thoughts.

Defendant reported that she started using alcohol at age 12 and began using illegal drugs, including marijuana, LSD, mushrooms, methamphetamine, Ecstasy, and possibly cocaine, by age 14. She continued using Ecstasy until age 27.[4] She began using crystal methamphetamine at age 18. She continued to use it regularly, except while she was pregnant with the twins. She reported variations in her pattern of methamphetamine use and said she used it less as time went on; at another point, however, she said she used it nearly every day until she was 25 years old. She was using it during the month of September 2010, the month she sent some of the text messages. A text message from the time she was visiting her mother in late September and early October 2010 indicated she was using methamphetamine. She told Dr. Shields she smoked it in Roxanne's garage four days before the killings.[5] In an October 10, 2010 text message to Paulson, defendant wrote, "You wanted me to stay thin and said it was important and okayed me to use to do that."

Dr. Shields testified that paranoia is a common side effect of ongoing methamphetamine use. Long-term drug use can cause mental problems well after someone uses the drug, and it can cause delusions.

Psychological testing administered by Dr. Shields showed that defendant did not have a significant probability of faked mental illness or impairment; suggested that she was experiencing suicidal ideation; showed that her intellectual functioning was well above average; showed that she had impaired executive functioning; and suggested that she had severe mental illness.

---

[4] Defendant was 28 years old at the time of the killings.

[5] Defendant told Dr. Shields this was the last time she used methamphetamine before the killings.

9

Dr. Shields believed that defendant's mental disorder played a role in her actions the night of the killings and that her actions were "largely a product of that mental illness in combination with the defective reasoning." In his view, drugs were not the primary cause of defendant's actions, although he acknowledged that there was a possibility that her long-term daily drug use could have caused her to have the issues she had on the day of the killings. In his opinion, defendant's actions were largely motivated by the delusional idea that she was being persecuted and that someone was going to take her daughters, separate them, enslave them in a camp setting, and torture them eternally. This delusion was fueled by the story Paulson had written about girls or women being taken to an island, mistreated, and killed. She believed that the UPS driver had keys to her apartment and was part of the conspiracy to harm her and the girls and that messages were embedded in videos or shows she and the children were watching after the move to California. She told Dr. Shields that while she was reading the novel Double Cross, she understood a reference to the time of day in the book to refer to the time that people were going to come and take her daughters away into slavery. Dr. Shields characterized this belief as an "idea of reference," which was a psychotic symptom.

A few days before the killings, defendant and the girls were eating pizza at Roxanne's house. Defendant told Dr. Shields the pizza made them sick, and she believed it was poisoned as part of an effort by someone, including Roxanne, to kill her and her daughters.[6] When Paulson told her he was going to Alaska instead of returning to California immediately, defendant believed that was a sign she or one of the girls was going to be taken to an enslavement camp in Alaska. She became increasingly desperate to prevent that from happening. She believed the only way she could save the children from enslavement was to kill them and herself. On the day of the killings, she sent Paulson a text that read, "Your [sic] separating them?" Defendant told Dr. Shields she

---

[6] The pizza incident occurred around the time defendant smoked methamphetamine in Roxanne's garage.

10

started the fire because she wanted to hide the evidence of what she had done so her family would not find out.

Dr. Shields concluded that defendant's delusion, or false belief that she and the girls were going to be enslaved, and her "ideas of reference" or belief that real events (such as Paulson's trip to Alaska) had another meaning, were symptoms of psychosis and that defendant's false belief was a product of her mental illness. In light of defendant's history of methamphetamine use, he had considered whether her beliefs were the product of intoxication. He stated that there was "no question that [defendant] had paranoid ideas related to meth use at times," but that there was also "some indication that she had paranoid or delusional ideas that were likely not related to intoxication with methamphetamine." He based this conclusion on defendant's statements to him, the toxicology report the day after the killings, and information related to defendant's subsequent treatment in the county jail.

Dr. Shields testified that defendant's mental disorder affected her ability to understand the nature and quality of her actions. She was not able to appreciate her acts' harmful nature because she believed she was saving the children from harm, not causing them harm. Dr. Shields opined that at the time of the killing, defendant was unable to recognize the moral or legal wrongfulness of her actions.

Defendant's county jail records indicated that by nine days after the killings, she said she was not suicidal. She told the jail psychiatric staff she never heard voices, although she later said otherwise. A jail psychiatrist who saw defendant for a year and a half diagnosed her with chronic and recurring adjustment disorder issues. She also received diagnoses of bipolar disorder with psychosis and depressive disorder with psychosis, and the psychiatrist also considered a diagnosis of a disorder on the schizophrenic spectrum. Defendant was given antipsychotic and antidepressive medication in jail. On October 25, 2011, defendant told another inmate to "cut themselves and hear voices and shit" so they could meet each other at the hospital. In November 2011, defendant reported paranoid thoughts that people were going to attack her. In April 2012, she used cocaine and drank 12 cups of coffee and was treated for a

11

possible overdose. She was described as paranoid, delusional, and psychotic. She stated that gangs were out to kill her for "snitch[ing]" on a boyfriend 10 years previously, and that if she had the means, she would slit her throat and hang herself. She said she "gets drugs from the guards."

Some of defendant's text messages from the period before the killings discuss the stress she experienced because she had to care for the children on her own. In one, she said she wanted to be young and free and be able to "party." Facebook messages defendant exchanged on October 3 and October 7 revealed no delusions, paranoia, or fear of Paulson.

### 2. Pablo Stewart, M.D.

Dr. Pablo Stewart, a psychiatrist, also evaluated defendant. He opined that on the day of the killings, she was suffering from major depressive disorder with psychotic features. He also opined that this was the most recent episode of a recurrent major depressive disorder that pre-existed her substance abuse.

Dr. Stewart had reviewed voluminous documents and treatment records and interviewed defendant three times. He noted that defendant was involuntarily hospitalized at age 12 after cutting her wrists. She had been drinking alcohol at the time she was taken to the hospital and had a .10 percent blood alcohol level. She began abusing multiple substances after that. There was no indication in defendant's records that she received follow-up care after her hospitalization, and Dr. Stewart noted that it was common for psychiatric patients who do not receive proper mental health care to self-medicate through substance abuse. Defendant's methamphetamine use from age 18 to 25 was "significant."

When defendant was a young adult living in San Diego between 2003 and 2005, she was diagnosed with major depressive disorder and began treatment with antidepressants. The records indicated that during a three-month period when defendant reported she was not using methamphetamine, she began to have paranoid delusions. There were times that she reported she was using methamphetamine but did not have psychotic symptoms. Defendant reported that she did not use methamphetamine during

12

her pregnancy with the twins and that she used it only occasionally in the ensuing period while she lived in Pennsylvania with an aunt. She did not report any psychotic symptoms during the time she was pregnant.

When defendant returned to California in August 2010 to live with Paulson, she was under a lot of stress and was ripe for a recurrence of major depression. She was having difficulty caring for the children and had less support than had been available in Pennsylvania. She was having sleep disturbances, was irritable, and said things people found difficult to understand. Dr. Stewart believed defendant was suffering from major depression in September and October of 2010.

Dr. Stewart opined that at the time of the killings, defendant was in a state of psychosis, suffering from paranoid delusions. He noted that while defendant was treated for her injuries at the hospital after the killings, a doctor thought she was suffering from a major depressive episode or a psychotic episode. Four days after defendant was transferred from the hospital to the jail, she was put on antipsychotic medication, which suggested that the psychiatrists at the jail believed she was experiencing a psychotic disorder. In jail, defendant was diagnosed at various points with bipolar disorder, schizophrenia, schizoaffective disorder, and adjustment disorder. Defendant was on antipsychotic medication during her entire time in custody.

Dr. Stewart testified he believed defendant's substance abuse history played a role in the crimes. She had reported using methamphetamine about once a week in the period before the homicide, which Dr. Stewart said contributed to her mental state. However, he believed her chronic depressive condition, which was exacerbated when she returned to California, was the primary reason for her altered mental state. He also testified that it takes two and a half days for methamphetamine to be eliminated from a person's system but that it can take longer in the case of someone who has used it for a prolonged period. In light of defendant's negative test after the killings, Dr. Stewart did not think the use of drugs had an appreciable impact on her mental state at the time of the killings. He thought it was very unlikely that defendant's delusions were the result of

13

methamphetamine withdrawal. Dr. Stewart was also aware that defendant's mother had tested her for drugs on her recent visit to San Diego and that the test was negative.

Dr. Stewart opined that defendant understood the nature and quality of her acts at the time of the killings, that is, she knew she had a sword and was going to kill her children. However, in his opinion, defendant was not capable of understanding that her actions were morally or legally wrong. He explained that defendant was operating under profound psychotic delusions which caused her to believe killing the children was the best thing she could do to protect them. He believed that drugs contributed to her delusions, but not to an appreciable degree, that the major factor affecting her thinking was her depression, and that in the absence of the depression she would not have killed her children.

Dr. Stewart acknowledged that the messages indicating defendant feared Paulson was part of a plot to harm her were sent in September and that defendant did not express that concern in any later messages. However, defendant had told Dr. Stewart that at the time of the killings she was afraid people were going to break into her apartment, kidnap her and her children, enslave them, and rape the children. He did not think the fact that defendant used the children's bodies to block the door indicated she understood her actions were wrong, because her psychotic plan was to burn the apartment down so there would be nothing for anyone to see.

### 3. *Janice Nakagawa, Ph.D.*

Dr. Janice Nakagawa, a psychologist, also evaluated defendant. As well as reviewing documents, she interviewed defendant three times. She concluded that defendant met the criteria for being not guilty by reason of insanity.

Defendant described to Dr. Nakagawa her belief that she and her children would be kidnapped and raped or made sex slaves. She thought the movie synopsis indicated Paulson planned to kidnap her, she was concerned that times mentioned in the novel Double Cross indicated when the door would be kicked in, she believed people were going to come and get her, and she heard helicopters outside and thought they were coming for her. On October 10, she began thinking of killing the girls. When she went

14

to the assistant manager's office on the day of the killings and found it closed, she thought that meant the people who planned to kidnap her were setting up their operations there. Defendant mentioned that she had asked the assistant manager to watch the girls while she moved the car, but said she was not afraid because the assistant manager was a pregnant woman and the people who were going to harm them were predominantly men. However, she was afraid to leave the house because she had heard noises in the ceiling, and she thought "they were coming to get her."

Defendant discussed the facts of the crime with Dr. Nakagawa. She described a telephone conversation she had with Paulson during the incident, saying "I get on the phone with Robert and told him about Lily and Tori, and say it's just like you wanted, and put the phone down and I get a book." She said she set the fire because it would be easier for her family if the house burnt down, and that if her family knew what had happened they would become involved with the people who were "after" her and the children. Dr. Nakagawa had noted that the text messages defendant sent did not show delusional or paranoid content; defendant said she did not want Paulson to know of her suspicions because if he did, he would carry out the plan sooner.

Defendant told Dr. Nakagawa she had bought approximately two grams of methamphetamine in September and that she continued to use it off and on until October. However, it appeared she was not under the influence of drugs the day of the killings.

Dr. Nakagawa opined that defendant was experiencing paranoia and a delusional belief, which led her to commit the offenses. She diagnosed defendant as either bipolar with psychotic features or having a psychotic disorder not otherwise specified. In Dr. Nakagawa's clinical judgment, defendant was not malingering. Dr. Nakagawa did not believe defendant understood the nature and quality of her acts because she was paranoid or delusional. She also believed defendant was not capable of understanding that her acts were legally or morally wrong. She testified that defendant's drug use could have been a factor contributing to the emergence of psychotic symptoms and that drug use could trigger predispositions to delusions, paranoia, or depression. However,

15

defendant's mental disorder, bipolar disorder with psychotic features, was independent of her drug use.

On cross-examination, the prosecutor elicited testimony about facts that Dr. Nakagawa did not know or consider when she reached her conclusions. In the latter part of September 2010, defendant had exchanged text messages with Paulson. One stated, "I am dying to smoke. I am leaving them alone here. They probably won't wake up but I can't help it. It's too hard to bring them everywhere." In a September 15, 2010 text message, defendant said, "I need some free time or I'll snap." Dr. Nakagawa had not taken these messages into account in reaching her conclusions.

Defendant told Dr. Nakagawa she smoked a "bowl" in Roxanne's garage and then had paranoid delusions about Roxanne poisoning the food and people being "out to get her," and that because of the delusions she packed up the girls in the middle of the night and drove them back to the apartment. Dr. Nakagawa acknowledged that these delusions were induced by methamphetamine. She believed the delusions continued for the next few days, with or without the drugs.

Defendant told Dr. Nakagawa that in the days leading up to the killings, she armed herself with a gun or sword and sat by the door waiting for people to come. Defendant said she packed up the teddy bears and other stuffed animals because they had cameras in their eyes. One of the girls was wearing a teddy bear harness when she was killed; Dr. Nakagawa did not ask defendant if that was consistent with her story that she had gotten rid of the stuffed animals.

On the day of the killings, defendant had a series of telephone calls and emails with a cousin, who reported that defendant said, "I don't know what to do," and "You are going to hate me." Paulson had said in a statement that defendant told him on the telephone on the evening of the killings, "I am so sorry. It's okay. We are just making a fire." Dr. Nakagawa agreed that these communications, as well as defendant's direction to Paulson to tell the girls it was an "accident" if they survived, could be taken into consideration in deciding whether defendant knew what she did was wrong.

16

## II.  DISCUSSION

### A.  Instruction on Hallucinations

In the guilt phase of the trial, defendant relied on the theory that due to her delusional beliefs, she did not premeditate or deliberate, and accordingly she was not guilty of first-degree murder.  The trial court instructed the jury pursuant to CALCRIM No. 627 as follows:  "A hallucination is a perception that is not based on objective reality. In other words, a person has a hallucination when the person believes that he or she is seeing or hearing or otherwise perceiving something that is not actually present or happening.  [¶] You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation."  Defendant contends that the instruction should have been modified to include delusions.  She argues that the evidence showed she suffered from *delusions* rather than *hallucinations* as defined in the instruction, and that under the instruction as given, the jury was precluded from considering the effects of her paranoid delusions in considering whether she acted with premeditation and deliberation.  The trial court's failure to do so, she argues, deprived her of her Sixth and Fourteenth Amendment rights to have the jury consider the evidence presented by the defense and determine whether she was guilty of a lesser offense.

We reject this contention on both procedural and substantive grounds.  First, we note that defendant did not ask the trial court to modify the instruction to refer to delusions, and she has therefore forfeited the issue.  "Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."  (*People v. Andrews* (1989) 49 Cal.3d 200, 218; see also *People v. Tuggles* (2009) 179 Cal.App.4th 339, 364-365.)  Defendant does not claim that the instruction was incorrect.  (See *People v. Padilla* (2002) 103 Cal.App.4th 675, 677 (*Padilla*) ["We hold that evidence of a hallucination—a perception with no objective reality—is . . . admissible to negate deliberation and premeditation so as to reduce first degree murder to second degree murder"].)  Moreover, our Supreme Court has held that instructions on the effect of a defendant's mental disease or disorder on his or her mental

17

state need not be given sua sponte; rather, they are "in the nature of pinpoint instructions required *to be given only on request* where the evidence supports the defense theory." (*People v. Ervin* (2000) 22 Cal.4th 48, 90-91, italics added.)

Defendant seeks to avoid this rule by arguing that it would have been futile to ask the trial court to include delusions in the instruction because the court had already rejected her interpretation of the law when it ruled that the only evidence that would be deemed to bear on premeditation and deliberation would be that reflecting hallucinations. (See *People v. Sandoval* (2001) 87 Cal.App.4th 1425, 1433, fn. 1 [failure to make argument is not waiver when it would have been futile].) The record does not support this contention. Before trial, defendant brought a motion in limine seeking a ruling on whether the trial court would instruct the jury that she was guilty only of manslaughter if she had acted in imperfect self-defense or imperfect defense of another, that is, that she acted in the actual but unreasonable belief that the killings were necessary to prevent imminent danger to her daughters. (CALCRIM No. 571.) The People opposed the instruction, in part on the ground that imperfect self-defense cannot be based on a psychotic delusion alone. (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1444, 1462.) Defense counsel argued that defendant's actions were not completely delusional because they were based on actual events and things she misinterpreted. The trial court denied the motion, reasoning that there was no authority that the defenses of imperfect self-defense or imperfect defense of another were available when a defendant intentionally killed a victim in order to save the victim from a worse fate. Defendant does not challenge this ruling.

Later, the parties presented argument to the court as to whether defendant could introduce evidence about her fears that Paulson was going to harm her or the girls. The prosecutor initially argued that defendant's fears were based on paranoia, not hallucination, and hence did not fall within the rule of *Padilla*, *supra*, 103 Cal.App.4th 675. In referring to defendant's belief that Paulson wanted to kill her, the trial court asked defense counsel, "So this is the delusions or—I don't know if we call it a delusion, we call it a hallucination? This is her—." Defense counsel argued that defendant's belief

18

qualified as a hallucination, that is, a perception not based on objective reality for purposes of CALCRIM No. 627. The prosecutor then argued that, although there was evidence of unreasonable beliefs in late September, defendant had no conversations on October 11 or 12 that showed delusional beliefs that Paulson would harm her or the girls. The prosecutor referred to the beliefs as "some hallucination that [defendant] was having at the end of September," and argued that "there [was] no evidence that this was going on at the time, on October 12th whatsoever." Defense counsel countered that there were text messages showing that defendant's delusions continued to exist on October 12, and argued that *Padilla* supported her position that "these hallucinations are relevant" to the question of premeditation and deliberation. The prosecutor, in her turn, disputed defense counsel's characterization of the October text messages, pointing out that they referred to the biological father giving up his parental rights and arguing, "That is not hallucinating."

The trial court ruled: "I'm going to allow you to present evidence, what you claim is hallucinations, on this issue. . . . 'I'm going to allow at least a good portion of this evidence, provided it does in fact tend to show the defendant was suffering from hallucinations about this time. I think there is an inference that can be made if there is evidence that she had these hallucinations within a day or two. I don't know exactly when, but I think these are factual matters for the jury to determine. . . . [I]t would be much clearer if the hallucinations had to do with a misunderstanding as to the act that she was committing or she didn't understand who these acts were directed at were her children [*sic*]. But that's not the nature of these hallucinations, supposedly. [¶] As I understand it, these hallucinations had to do with her belief that the children were in imminent peril of being kidnapped and tortured, and therefore this was her alternative as she saw it. I don't know what evidence there is of that at this point in particular, but you can bring all that out." When the prosecutor argued that under *Mejia-Lenares*, *supra*, 135 Cal.App.4th 1437 evidence of unreasonable fear was inadmissible to show imperfect self-defense, the court stated, "I am allowing evidence of hallucination and if part of that—if the argument ultimately is fear induced by these is what caused her to not to be able to form the ability to premeditate, that can be the argument, I suppose. But the

19

evidence will be as to the actual hallucination." The court concluded by asking counsel, "Are we all on the same page here?" to which they responded, "Yes."

Despite the prosecutor's initial characterization of defendant's fears as being based on paranoia, not hallucination, it is clear from this colloquy that at the time the trial court made its ruling, both it and counsel understood that the "hallucinations" in question were defendant's delusional beliefs. Nothing in these discussions suggests that it would have been futile to ask the trial court to modify the instruction to include delusions because the trial court had already rejected defendant's interpretation of the law; rather, the court *accepted* defense counsel's characterization of defendant's delusions as hallucinations for purposes of *Padilla*, *supra*, 103 Cal.App.4th 675 and CALCRIM No. 627.

Although it is not necessary to reach this point in order to resolve this case, we do not disagree with our dissenting colleague's conclusion that the rule of *Padilla*, *supra*, 103 Cal.App.4th 675 applies to forms of delusional thinking that do not qualify as hallucinations.[7] However, we do disagree with the dissenting opinion's interpretation of the record to the extent it concludes it would have been futile for defense counsel to request a modification of CALCRIM No. 627 to include a reference to delusions because the trial court had already ruled that *Padilla* did not apply to nonhallucinatory delusions. Our reading of the transcript persuades us that the trial court and counsel understood the term "hallucinations" to encompass defendant's delusional beliefs.

We also reject defendant's contention on the merits. "When considering a claim of instructional error, we view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229; see also *People v. Mills* (2012) 55 Cal.4th 663, 677 [in

---

[7] In fact, in *Padilla,* the defendant "hallucinate[d] that [the victim] had killed [defendant]'s father and brothers." (*Padilla*, *supra*, 103 Cal.App.4th at p. 677.) There is no indication the defendant was suffering under a visual or auditory hallucination in which he believed he was seeing or hearing the actual killings.

20

considering due process challenge to ambiguous jury instruction, question is whether there is reasonable likelihood jury applied instruction in a way that violates constitution].)

Defendant points out that the prosecutor argued in her closing argument that there was no evidence she was suffering from hallucinations the day of the killings. According to defendant, this argument suggested to the jury that her delusions did not qualify as hallucinations for purposes of CALCRIM No. 627. The record does not support this conclusion. The prosecutor made this statement while summing up her argument that, although defendant had expressed irrational fears of her fiancé a week or two previously, there was no evidence she was experiencing such fears on the day of the killings. Defense counsel then argued that the hallucination instruction was important because defendant had irrational beliefs that Paulson intended to kill her and harm the girls and that he had a vendetta against her. In her rebuttal, the prosecutor did not challenge defense counsel's characterization of the delusions as hallucinations, but argued again that defendant did not appear irrational on the day of the killings. There is no reasonable possibility that the jury interpreted the instruction to preclude it from considering defendant's delusions.[8]

B. Substantial Evidence to Support Sanity Verdict

Defendant contends the evidence is insufficient to support the jury's finding that she was sane when she killed her children.

If a defendant pleads both not guilty and not guilty by reason of insanity, the trial is bifurcated. In the guilt phase of the trial, which occurs first, the defendant is conclusively presumed to have been legally sane at the time of the offense. (§ 1026, subd. (a); *People v. Elmore*, *supra*, 59 Cal.4th at pp. 140-141.) If the defendant is found guilty, the trial proceeds to the sanity phase, in which the defendant has the burden to

_____

[8] We are unpersuaded by defendant's argument that our Supreme Court's decision in *People v. Elmore* (2014) 59 Cal.4th 121, 136, footnote 7 indicates that the term "delusion" includes hallucinations, but not vice versa, and that the terms are therefore not interchangeable for purposes of CALCRIM No. 627. On this record, there is no basis to conclude the jury did not understand the instruction to include defendant's claimed delusions that she and the girls were at risk of harm.

prove "by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§§ 25, subd. (b); 1026, subd. (a); *Elmore*, *supra*, 59 Cal.4th at p. 141.) Our Supreme Court has interpreted this statutory language to mean that insanity can be shown under either the "nature and quality" prong or the "right from wrong" prong of the test. (*People v. Skinner* (1985) 39 Cal.3d 765, 775-777 (*Skinner*).) The court has also held that "a defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful." (*Id.* at p. 783.)

As defendant points out, each of the experts who testified concluded defendant was not able to understand that her actions were legally or morally wrong. However, "expert testimony, even if uncontradicted, is not binding on the trier of fact, and may be rejected, *especially where experts are asked to speculate about a defendant's state of mind at the moment the crime was committed. . . .* The trier of fact may consider the reasons given for expert opinions, and may weigh testimony with all of the evidence including the circumstances before, during, and after the offenses." (*People v. Green* (1984) 163 Cal.App.3d 239, 243-244, italics added.) As our Supreme Court has stated, " 'However impressive [a] seeming unanimity of expert opinion may at first appear . . . our inquiry on this just as on other factual issues is necessarily limited at the appellate level to a determination whether there is substantial evidence in the record to support the jury's verdict of sanity . . . under the law of this state. [Citations.] It is only in the rare case when "the evidence is uncontradicted and entirely to the effect that the accused is insane" [citation] that a unanimity of expert opinion could authorize upsetting a jury finding to the contrary.' [Citation.] Indeed we have frequently upheld on appeal verdicts which find a defendant to be sane in the face of contrary unanimous expert opinion. [Citations.]" (*People v. Drew* (1978) 22 Cal.3d 333, 350, superseded by statute on other grounds as stated in *Skinner*, *supra*, 39 Cal.3d at pp. 768-769.) The chief value of an expert's testimony " 'rests upon the *material* from which his opinion is fashioned and the

22

*reasoning* by which he progresses from his material to his conclusion.' " (*Drew*, at p. 350.)

One more prefatory note: A defendant may not be found insane solely on the basis of addiction to, or abuse of, intoxicating substances. (§ 29.8.) This provision "makes no exception for brain damage or mental disorders caused solely by one's voluntary substance abuse but which persists after the immediate effects of the intoxicant have dissipated. Rather, it erects an absolute bar prohibiting use of one's voluntary ingestion of intoxicants as the sole basis for an insanity defense, regardless whether the substances caused organic [brain] damage or a settled mental disorder which persists after the immediate effects of the intoxicant have worn off." (*People v. Robinson* (1999) 72 Cal.App.4th 421, 427.) Pursuant to this rule, the jury was instructed that "[i]f the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, and that settled mental disease or defect combined with another mental disease or defect, that may qualify as legal insanity. A settled disease or defect is one that remains after the effects of the drugs or intoxicants has worn off." (CALJIC No. 3450.)

On this record, we conclude that the jury could have found that defendant did not meet her burden to show she was insane at the time of the crimes. Because the defendant has the burden of proof on the issue of insanity, "the question on appeal is not so much the substantiality of the evidence favoring the jury's finding as whether the evidence contrary to that finding is of such weight and character that the jury could not reasonably reject it." (*People v. Drew*, *supra*, 22 Cal.3d at p. 351; accord *People v. Duckett* (1984) 162 Cal.App.3d 1115, 1119 (*Duckett*).) Defendant had a long history of drug use, particularly abuse of methamphetamine. She had used methamphetamine on a nearly daily basis from age 18 to 25 and had been using it in the weeks preceding the killings, up to at least four days beforehand, during the time she expressed fears of Paulson and others. Dr. Shields acknowledged that paranoia is a common side effect of ongoing methamphetamine use, that long-term drug use can cause delusions, and that long-term drug use can cause mental problems well after someone uses the drug. There was also

23

evidence from which a jury could conclude that the expert opinions did not take sufficiently into account the overlap between the times defendant was using drugs and the times she suffered delusions. Defendant expressed fear of Paulson and others in late September 2010, at a time there is evidence she was using methamphetamine. She thought someone had poisoned her pizza on the day she admitted to last smoking methamphetamine. In 2012, defendant used cocaine and was treated for a possible overdose; she was paranoid and delusional and stated gangs were out to kill her for "snitch[ing]" on a boyfriend 10 years previously. Dr. Stewart testified that defendant's substance abuse history played a role in the crimes, although he did not believe it was the primary cause of her altered mental state. Dr. Nakagawa testified that defendant's drug use could have contributed to the onset of psychosis, although she believed defendant had a disorder with psychotic features independent of the drug use. She also acknowledged that defendant's delusions a few days before the killings, after which she drove the girls home from Roxanne's house in the middle of the night, were induced by methamphetamine. Even in the face of the unanimous expert opinions, the jury could rationally reject those opinions and find that defendant's long-term and recent drug use, singly or in combination, caused any psychotic symptoms she was experiencing at the time of the killings and that defendant had not met her burden to show she was legally insane.

The record also contains evidence from which the jury could conclude that defendant knew the nature and quality of her acts and that her actions were both legally and morally wrong. She told Dr. Nakagawa she began planning to kill the girls about two days before she did so. Her own explanation of events indicates that she intended to kill them. She told a cousin on the day of the killings, "You are going to hate me." On the telephone after the killings, she told Paulson to tell the girls "it was an accident" if they survived. There was also evidence that defendant was overwhelmed by the demands of caring for the girls and wanted to be young and free and to "party." This evidence could support a finding that defendant not only knew the nature of her acts but also knew they were both legally and morally wrong when she committed them.

24

We are not persuaded otherwise by defendant's reliance on *Duckett*, *supra*, 162 Cal.App.3d 1115. In *Duckett*, a divided court concluded the jury could not reasonably reject the three experts' unanimous opinions of defendant's insanity where there was evidence that defendant reported he saw demons; that he was obsessed with the victim and believed she was a witch who was practicing voodoo on him; that he had a long history of chronic paranoid schizophrenia characterized by disordered thoughts, delusions, hallucinations, inappropriate affect, and bizarre behavior; that while in the hospital, he developed a "delusional system" within two weeks of being taken off medications on an experimental basis; and that before the offense, he had ceased taking his medications. (*Id*. at pp. 1120-1123.) Additionally, the defendant had previously shot other victims; for these crimes, he had been found legally insane, and was confined to a mental hospital for five years. Within a month of his release, he shot and killed the victims in his current case. (*Id*. at p. 1118.) Here, the evidence of persistent insanity and delusions was far less compelling. Moreover, the evidence here was susceptible to an interpretation that defendant's delusions stemmed from her drug use, which also distinguishes this case from *Duckett*.

*People v. Samuel* (1981) 29 Cal.3d 489 is similarly distinguishable. There, the evidence of incompetence was overwhelming: as our high court has recently explained, " 'Five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified to Samuel's incompetency, and four psychiatric reports were admitted into evidence. [Citation.] Each witness and every report concluded Samuel was incompetent to stand trial. [Citation.] In response, the prosecution offered no expert testimony and only two lay witnesses, neither of whom contradicted any of the defense testimony. [Citation.] . . . Prosecution witnesses merely testified regarding Samuel's escape from Patton State Hospital and his ability to perform routine manual tasks.' [Citation.] On that record, we found that no reasonable trier of fact could reject the defense evidence of incompetency. [Citations.]' " (*People v. Mendoza* (2016) 62 Cal.4th 856, 882, citing *Samuel*, at p. 506.) The question before the experts here was not defendant's current competence to stand trial, but her mental state at

the time of the crimes, and for the reasons we have discussed, the jury could reasonably reject their opinions.

## C. Sanity Instruction

The trial court instructed the jury pursuant to CALCRIM No. 3450 as follows: "You have found the defendant guilty of murder and inflicting injury on a child under eight causing death. Now you must decide whether she was legally sane at the time she committed the crime. [¶] The defendant must prove that it is more likely than not that she was legally insane when she committed the crimes. [¶] The defendant is legally insane if: [¶] First, when she committed the crimes, she had a mental disease or defect. [¶] And secondly, because of that disease or defect she was incapable of understanding the nature and quality of her acts, or was incapable of knowing or understanding that her acts were morally or legally wrong. [¶] None of the following qualifies as a mental disease or defect for purposes of an insanity defense: Personality disorder, adjustment disorder, seizure disorder, or an abnormality of personality or character made apparent only by a series of criminal or antisocial acts. [¶] If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, and that settled mental disease or defect combined with another mental disease or defect, that may qualify as legal insanity. A settled disease or defect is one that remains after the effects of the drugs or intoxicants has worn off. [¶] You may consider any evidence that the defendant had a mental disease or defect before the commission of the crimes. If you are satisfied that she had a mental disease or defect before she committed the crimes, you may conclude that she suffered from the same condition when she committed the crimes. You must decide whether that mental disease or defect constitutes legal insanity."

Defendant contends this instruction suffers from three flaws. First, she points to the portion of the insanity test referring to her understanding that the acts were "morally or legally wrong," and argues that the jury could have understood that phrase to mean "morally *and* legally wrong." Second, she argues that the instruction did not make clear that her incapacity to understand right from wrong did not refer to a *general* incapacity so to understand, but to her capacity "in respect of the 'very act' charged." Third, she

26

contends the paragraph listing the conditions that would not support a finding of insanity—including adjustment disorder—should have been omitted because it could confuse and mislead the jury.

We reject each of these contentions. First, defendant forfeited her first two challenges by failing to raise them at trial. (See *People v. Andrews*, *supra*, 49 Cal.3d at p. 218 ["Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language"]; *People v. Tuggles*, *supra*, 179 Cal.App.4th at pp. 364-365.)

In any case, we find her arguments on these issues entirely unpersuasive. As to the first argument, as we have noted, our high court has held that "a defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful." (*Skinner*, *supra*, 39 Cal.3d at p. 783.) Defendant argues that the jury might have misinterpreted the phrase "legally or morally wrong" in the instruction to mean "morally *and* legally wrong" and as a result might have concluded defendant must be considered sane if she knew the killings were unlawful, whether or not she was capable of understanding their moral wrongfulness. For this contention, she relies on cases noting that the words "and" and "or" are sometimes carelessly used in an interchangeable manner. (See *People v. Horn* (1984) 158 Cal.App.3d 1014, 1027-1028 and cases cited therein; *Skinner*, *supra*, 39 Cal.3d at p. 769.) But defendant offers no basis other than speculation that the jury adopted this strained reading of the instruction.

We similarly find meritless defendant's second contention—that the instruction failed to inform the jury that she had to be incapable of understanding the wrongfulness of the "very act" charged. (See *People v. Horn*, *supra*, 158 Cal.App.3d at pp. 1024-1025 ["[T]he wrongfulness . . . had to be in relation to the very act with which the defendant was charged"].) The instruction referred to defendant's capacity to know or understand "that *her act* was legally or morally wrong." (Italics added.) The only reasonable interpretation of this language is that it refers to the offenses with which defendant was charged.

27

We likewise reject defendant's contention that the instruction contained surplus language that confused and misled the jury, specifically, the paragraph stating that various conditions, including adjustment disorder, were insufficient to establish insanity.[9] Defendant points out that the only indication she had an adjustment disorder was found in jail records discussed by the mental health experts, which were not admitted for their truth; rather, the jury was instructed, "Doctors John Shields, Pablo Stewart and Janice Nakagawa testified that in reaching their conclusions as expert witnesses they considered statements made by mental health providers, jail staff, police officers, friends and relatives of the defendant, and the defendant herself, including texts and e-mails. You may consider these statements only to evaluate the expert's opinion. *Do not consider these statements as proof that the information contained in the statements is true*." (Italics added.) In closing argument, the prosecutor pointed out that while cross-examining the experts, she had confronted them about the fact that the jail records showed defendant was being treated for adjustment disorder.

Because the evidence of adjustment disorder was not admitted for its truth, defendant argues, the instruction referring to it was not responsive to the evidence and was likely to confuse the jury. We disagree. The jury was instructed that in evaluating the expert's opinions, it could consider the material upon which the experts relied, and that material included the diagnosis of adjustment disorder. Nor do we see any possibility of confusion. Defendant's theory of the case was that she suffered from a mental disease with psychotic, delusional features; the prosecution's theory was that there was no evidence defendant was suffering delusions on the day of the killings and that, if she was, they were a result of her drug use. There is no basis to conclude that the listing of conditions insufficient to support a finding of insanity misled the jury in any way.

_____

[9] Defendant objected to this portion of the instruction at the beginning of the sanity phase of the trial. Although she did not renew her objection after evidence had been presented, we will not treat the issue as forfeited.

## III. DISPOSITION

The judgment is affirmed.

                                    _____

                                    Rivera, J.

I concur:

_____

Ruvolo, P.J.

**CONCURRING AND DISSENTING OPINION OF STREETER, J**.

There is a difference between a delusion with no basis in objective reality, commonly called a hallucination, and a delusion based on a distorted perception of reality. The distinction may seem like a matter of semantics, but it has substance. Both forms of delusion are recognized as psychoses in the scientific literature. (See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000), p. 324 (DSM-IV-TR) [drawing distinction between "bizarre" delusions which are not based in reality and "nonbizarre delusions" which are reality-based].)[1] I part ways with the majority because I think the semantics mattered in this case. McCarrick's guilt phase defense was an attempt to limit her culpability to second degree murder. Because CALCRIM No. 627[2]—which framed that defense for the jury—speaks solely in terms of "hallucinations," the People were able to argue in closing that she was not hallucinating on the day she killed her children, and so there was nothing in the evidence to negate premeditation and deliberation. The argument was devastating, because it was irrefutably true: On the day of the killings and in the weeks before, McCarrick was suffering from grotesque, reality-based delusions, but not from hallucinations.

### I.

The language of CALCRIM No. 627 has its genesis in *People v. Padilla* (2002) 103 Cal.App.4th 675, 677–678 (*Padilla*), a case involving a prisoner, Padilla, who killed his cellmate by gouging his eyes out. At trial, Padilla tried to present "the testimony of

---

[1] "Delusions are deemed bizarre if they are clearly implausible, not understandable, and not derived from ordinary life experiences. (e.g., an individual's belief that a stranger has removed his or her internal organs and replaced them with someone else's organs without leaving any wounds or scars.) In contrast, nonbizarre delusions involve situations that can conceivable occur in real life (e.g. being followed, poisoned, infected, loved at a distance, or deceived by one's spouse or lover.)" DSM-IV-TR, at p. 324.

[2] See CALCRIM No. 627, New January 2006, Revised February 2015.

two psychologists [to explain] that he committed a retaliatory homicide after hallucinating that [the cellmate] had killed [his] father and brothers." (*Id.* at p. 677.) The court excluded the testimony at the guilt phase, but allowed it at the sanity phase. (*Ibid.*) On appeal from his first degree murder conviction, Padilla argued it was error to exclude the testimony during the guilt proceedings. He contended, first, that the testimony was relevant to a defense of sudden provocation or passion, which would have eliminated malice entirely and reduced the crime from murder to manslaughter, and, second, that it was admissible to negate premeditation and deliberation, which would have reduced his culpability for murder from first to second degree. The Court of Appeal rejected the former point, but agreed with the latter. (*Id.* at pp. 677–678.)

The opinion in *Padilla* explains that a "hallucination is a perception with no objective reality. (American Heritage Dict. (4th ed. 2000) p. 792 ['[p]erception of visual, auditory, tactile, olfactory, or gustatory experiences *without an external stimulus'* (italics added)]; Oxford English Dict. (2d ed.1989) p. 1047 ['apparent perception (usually by sight or hearing) of an external object *when no such object is actually present'* (italics added) ]; Webster's 3d New Internat. Dict. (1986) p. 1023 ['perception of objects *with no reality'* (italics added)].) A perception with no objective reality cannot arouse the passions of the ordinarily reasonable person." (*Padilla*, *supra*, 103 Cal.App.4th 675, 678–679.) With this definition in mind, the court turned to Padilla's two cited points of error, holding as follows. First, "[f]ailing the objective test, [a] hallucination cannot as a matter of law negate malice so as to mitigate murder to voluntary manslaughter—whether on a 'sudden quarrel or heat of passion' theory of statutory voluntary manslaughter [citations] or on a 'diminished actuality' theory of nonstatutory voluntary manslaughter [citations]." (*Padilla*, *supra*, 103 Cal.App.4th at pp. 678–679.) Second, a hallucination—as a subjective phenomenon playing out in the defendant's mind—can "negate deliberation and premeditation so as to reduce first degree murder to second degree murder." (*Id.* at p. 677.). This second prong of the holding in *Padilla* is the

2

animating principle behind CALCRIM No. 627, which instructs juries they may "consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation." [3]

**II.**

Also relevant here, although tangentially, is *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437 (*Mejia-Lenares*). In *Mejia-Lenares*, the appellant, Mejia-Lenares, was convicted of second degree murder after "he fatally stabbed Harry Howard out of fear that Howard was transforming into the devil and wanted to kill him. Appellant conceded that he just imagined Howard was turning into the devil . . . ." (*Id.* at p. 1444.) Like Padilla, Mejia-Lenares tried to use his hallucinations to defeat malice outright, thereby reducing his crime from murder to manslaughter, but rather than argue provocation or passion, which was Padilla's defense, Mejia-Lenares argued imperfect self-defense. "[A] reasonable person would not have perceived the circumstances as life-threatening," Mejia-Lenares contended, but in his case, "because of his mental disease," he "actually but unreasonably believed Howard was threatening his life and so he needed to defend himself by using lethal force." (*Id.* at p. 1445.) The Court of Appeal rejected this argument, extending the first prong of *Padilla*'s holding to imperfect self-defense. (*Id.* at p. 1446.)

At the time, the language of CALJIC No. 8.73.1, the predecessor to CALCRIM No. 627, embodied only *Padilla*'s second prong—which remains the case today in both forms of this pattern instruction—thus permitting juries to consider evidence of hallucination as it may be relevant to the degree of a murder. Appellant Mejia-Lenares tried to claim CALJIC No. 8.73.1 should have been modified in his case to permit

---

[3] CALCRIM No. 627 is a substantively identical restatement of CALJIC No. 8.73.1, which was introduced in 2003. The sole authority cited in the Use Note for CALJIC No. 8.73.1 is *Padilla*, *supra*, 103 Cal.App.4th 675, which was decided in late 2002. (See Use Note to CALJIC No. 8.73.1 (7th Ed. 2003).)

consideration of hallucinations not just in determining the degree of murder, but also in determining the issue of malice aforethought as a predicate whether murder may be found at all. The Court of Appeal rejected this contention, explaining: "To allow a true delusion—a false belief with no foundation in fact—to form the basis of an unreasonable-mistake-of-fact defense erroneously mixes the concepts of a normally reasonable person making a genuine but unreasonable mistake of fact (a reasonable person doing an unreasonable thing), and an insane person. Thus, while one who acts on a delusion may argue that he or she did not realize he or she was acting unlawfully as a result of the delusion, he or she may not take a delusional perception and treat it as if it were true for purposes of assessing wrongful intent. In other words, a defendant is not permitted to argue, 'The devil was trying to kill me,' and have the jury assess reasonableness, justification, or excuse as if the delusion were true, for purposes of evaluating state of mind." (*Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1456.)

Our Supreme Court recently adopted the holding of *Mejia-Lenares* and embraced its reasoning in *People v. Elmore* (2014) 59 Cal.4th 121, 130 (*Elmore*), a case in which the defendant, Elmore, who, "by all accounts, [was] mentally ill," "had repeatedly been institutionalized and diagnosed as psychotic." "On the day of the killing [Elmore] . . . became fidgety and anxious" and "[a]t one point . . . began to crawl under cars as his family and a friend tried to speak with him." (*Ibid.*) He then went out on the street with a paint brush handle honed into a sharp weapon-like object, and, without warning or provocation, suddenly accosted an unsuspecting passerby on the sidewalk, Ella Suggs, who did not know Elmore and never said a word to him. Elmore stabbed Suggs to death with the paint-brush handle. (*Ibid.*) At trial, he gave an incoherent and confused account of his actions, explaining that " 'somebody [said] something violent' " to him on the street, but he could not say who it was or whether it was a man or woman. (*Id.* at p. 131.)

The question in *Elmore* was, as it had been in *Mejia-Lenares*, "whether the doctrine of unreasonable self-defense is available when belief in the need to defend

4

oneself is entirely delusional." (*Elmore*, *supra*, 59 Cal.4th at p. 130.) Adopting the holding of *Mejia-Lenares*, the Court said no, explaining that "[h]ere, defendant claims his request for an instruction on unreasonable self-defense should have been granted, even though his perception of a threat was entirely delusional." (*Id.* at p. 134; see *id*. at p. 138 [referring to "purely delusional perceptions of threats to personal safety"].) The Court explained that "[t]he line between mere misperception and delusion is drawn at the absence of an objective correlate. A person who sees a stick and thinks it is a snake is mistaken, but that misinterpretation is not delusional. One who sees a snake where there is nothing snakelike, however, is deluded. Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind." (*Id*. at p. 137.)

**III.**

*Elmore* and *Mejia-Lenares* involved, respectively, an "entirely delusional" belief, "divorced from the circumstances," and not grounded on an "objective correlate" (*Elmore*, *supra*, 59 Cal.4th at p. 137), and "a perception of facts not grounded in reality" (*Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1453). They do not address whether a defendant laboring under a subjective misperception of reality may use that type of delusion to argue she did not actually deliberate or plan a homicidal act.

*Padilla* does address that question, and, quite properly, the trial court considered its applicability here after entertaining argument specifically focused on whether, under the second prong of *Padilla*, McCarrick would be allowed to try to negate premeditation and deliberation based on testimony from various percipient witnesses who observed her bizarre and increasingly irrational behavior in the days and weeks before the killings. With the preliminary observation that "we are in a very tricky area," the court ruled that she would be allowed to do so. This ruling was unquestionably correct, fully in line not just with *Padilla* but with what has come to be called the defense of "diminished actuality," since that defense put to the test whether the People proved McCarrick " 'actually formed' " the specific intent requisite for first degree murder. (*People v. Vieira* (2005) 35 Cal.4th 264, 292, quoting *People v. Coddington* (2000) 23 Cal.4th 529,

582, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; see Cal. Pen. Code, § 28; *People v. Mills* (2012) 55 Cal.4th 663, 671 (*Mills*).)

Where the trial court went wrong was in limiting *Padilla* to its facts. It is understandable why the court did so, because *Padilla* is a hallucination case and because the language of CALCRIM No. 627 speaks only of hallucinations. But the rationale for CALCRIM No. 627, articulated in *Padilla* itself, is not confined to mental disturbance as it happened to be manifested in that case (or for that matter in *Elmore* or *Mejia-Lenares*.)[4] Since all forms of delusion and hallucination involve subjective disturbances within the mind, there is no reason a defendant should be limited to arguing mental delusion as the basis for a diminished actuality defense only in a situation where she has acted under the influence of some imagined or manufactured version of reality, to the exclusion of delusionary thinking more broadly defined. In my view, CALCRIM No. 627 is flawed because it limits diminished actuality defenses based on mental disturbance to hallucinations. If we were to reach the guilt phase instructional issue McCarrick has raised here—and I think we should—I would therefore hold it was error not to modify CALCRIM No. 627 sua sponte to encompass all forms of mental delusion, including hallucinations.

Because it is rare that the difference matters, courts do not draw a crisp distinction between "hallucinations" and "delusions." Some of the reported cases use the term "delusion" in a manner that appears to equate it in meaning with "hallucination,"[5] others

---

[4] CALCRIM No. 627, as revised in February 2015, cites as authority not only *Padilla*, but *Mejia-Lenares* and *Elmore* as well. (Use Note to CALCRIM No. 627 (Feb. 2015 Rev.).)

[5] E.g., *Elmore*, *supra*, 59 Cal.4th at p. 146; *Mejia-Lenares*, *supra*, 135 Cal.App.4th at pages 1444, 1454; see also *People v. Gutierrez* (1986) 180 Cal.App.3d 1076, 1080, 1084 (defendant experienced "irrational delusions" as evidenced by statements that "she started seeing her children as birds on the day in question and 'didn't know they were children at that time' " and "just wanted to kill the birds because she felt they were an evil force").

6

use it in its broader sense to mean misperceptions of objective reality,[6] and others seem to use both terms and both concepts interchangeably.[7] Even cases that commit definitively to one of these two terms, upon probing, are not so clear. For example, the majority seems to suggest that, although the *Padilla* court used only the term "hallucination," it might have meant something broader because there was "no indication the defendant was suffering under a visual or auditory hallucination in which he believed he was seeing or

---

[6] E.g., *People v. Wetmore* (1978) 22 Cal.3d 318, 321 (*Wetmore*) (in burglary case against defendant with a "long history of psychotic illness" who "entered an apartment under a delusion that he owned that apartment and thus did not enter with the intent of committing a theft or felony," conviction reversed on ground that excluded psychiatric evidence of mental illness was admissible to negate specific intent), superseded by statute as explained in *Mills*, *supra*, 55 Cal.4th at page 671.

[7] E.g., *People v. Leeds* (2015) 240 Cal.App.4th 822, 825–828 (reversing sanity verdict for instructional error where defendant, who mistook his father for an intruder, shot him to death and then chased down and killed two of his father's employees, believing them to be assassins sent by the Mexican Mafia; defendant had a "well-documented history of delusions and hallucinations," claimed to have seen helicopters in the sky and missiles being fired, displayed "fearful and panicky demeanor just before the killings, and [had a] false belief that his father was brandishing a pistol when he kicked open the door to the back office"); *People v. Nicolaus* (1967) 65 Cal.2d 866, 873, 875 (defendant described by a psychiatrist as being "delusional" and suffering from "visual and auditory hallucinations" when he killed his three children, "frequently made irrational statements; [said] he was like God; [said] he could perform miracles and control the world;…believed devoutly in Nazism as a way of life, sometimes…reacted abnormally and violently to commonplace occurrences; . . . believed everyone was against him; . . . felt his mother-in-law was trying to break up his marriage and made violent threats to her"; first degree capital murder convictions reduced to second degree on automatic appeal to California Supreme Court), disapproved on other grounds in *Wetmore*, *supra*, 22 Cal.3d at pages 323–325 and footnote 5; *People v. Wells* (1949) 33 Cal.2d 330, 344–345, 354 (life prisoner who possessed "abnormal fear for his personal safety," causing him to "react to [a perceived threat] more violently and more unpredictably than the same stimulus applied to a normal person," even though "laboring under…some insane delusion or hallucination," was still capable of the "malice aforethought" necessary to support conviction for assaulting a guard, thus subjecting him to a capital sentence under section Penal Code section 4500; conviction and sentence affirmed on automatic appeal to California Supreme Court), disapproved on other grounds in *Wetmore*, *supra*, 22 Cal.3d at pages 323–325 and footnote 5.

hearing the actual killings." (Maj. opn., *ante*, at p. 21, fn. 7.)  I question this interpretation of the case,[8] but would suggest that the fact we read the case so differently provides yet another illustration of the uncertain meaning of the labels "hallucination" and "delusion" as used in case law.

In the end, not much can be gleaned from how we appellate judges use the terms "delusion" and "hallucination," since appellate usage typically tracks the choice of terminology by testifying alienists in the cases under review, often where both phenomena were involved and there was no reason to make a distinction.[9]  The lack of terminological precision in the case law simply underscores why, to eliminate any confusion in future applications of CALCRIM No. 627 (or its CALJIC counterpart), we should address whether this pattern instruction should have been modified here to cover not just hallucinations, but all forms of delusionary thinking, whether based on a false or

---

[8] As I read *Padilla*, there was no "actual killing," which is why appellant Padilla's description of that supposed event is described as a hallucination.

[9] From what little evidence there is in the published cases of how CALCRIM No. 627 and CALJIC No. 8.73.1 are used in practice, there is some indication that trial courts recognize the need to modify it where, as here, reality-based delusions are involved, or are mixed with non-reality based delusions.  In *People v. Gana* (2015) 236 Cal.App.4th 598, 601 for example, the defendant, Gana, was convicted of first degree murder for shooting her husband to death and the willful, deliberate and premeditated attempt to shoot her two sons.  She had breast cancer, her mental state was affected by chemotherapy drugs, she was suffering from major depression; and believed her family could not live without her, and thus felt she needed to kill them so " 'we can all die together.' " (*Id.* at p. 605.)  For weeks before the killing, Gana "had suicidal thoughts and developed a plan to kill her husband and children before taking her own life. [She] told the investigators she heard a voice in her head telling her that she needed to carry out her scheme." (*Id.* at p. 603.)  At trial she claimed she did not premeditate and deliberate, and CALJIC No. 8.73.1 was one of the jury instructions given. (*Id.* at pp. 604–605.)  The Court of Appeal described the instruction as follows:  "CALJIC No. 8.73.1 (evidence of *hallucination or delusion* may be considered 'on the issue of whether' defendant 'killed or attempted to kill with or without deliberation and premeditation and/or lying in wait')." (*Id.* at p. 605, italics added; see also *id.* at p. 614 [quoting what appears to be prosecutor's paraphrase of CALJIC No. 8.73.1:  "If you find it to be true that the defendant suffered from a *hallucination and/or delusion*, you may consider the impact of this hallucination and/or delusion, if any"], italics added.)

manufactured perception of objective reality or some distorted perception of real events. This case illustrates how consequential the issue can be, if left to juries to decipher without specific guidance.

## IV.

The majority suggests counsel on both sides and the court agreed that delusions and hallucinations are one and the same. I read the record somewhat differently. In pretrial argument on a motion in limine concerning the applicability of *Mejia-Lenares*—an argument McCarrick lost when the trial court ruled, correctly, that her irrational fears could not support a claim of imperfect self-defense—her counsel was quite clear that these fears were not "completely delusional as they were in *Mejia-Lenares.*" Later, during the guilt phase trial, when the admissibility of McCarrick's fears to negate premeditation and deliberation under the second prong of *Padilla's* holding arose, counsel did, it is true, seem to accept the idea that delusions and hallucinations are interchangeable, but she did so only after the court sounded a note of skepticism about the appropriate terminology, interjecting "I don't know if we call it a delusion," and then immediately asking whether "we call it a hallucination?" Although the People pin blame on the defense for equating delusions and hallucinations, the quote from McCarrick's counsel to which they cite is a *response* to the court's inquiry during this colloquy, and appears to be nothing more than an effort to fit the evidence within a reading of the law the court seemed inclined to take—and eventually did take.

Who originally came up with the notion that the term "hallucinations," alone, may be used to describe the evidence of McCarrick's paranoid delusions is not definitively clear in the record, but the sequence of events suggests it is more fairly attributable to the People than to the defense. The specific issue under discussion when this point of terminology surfaced was the admissibility of proffered defense testimony from Paulson and "three or four other witnesses who would testify that Ms. McCarrick reached out to them, either spoke to them or sent them test messages that she was afraid of Mr. Paulson and that he was going to hurt—kill her and hurt the girls." The People insisted that this evidence "doesn't rise to the level of a hallucination . . . . Hallucination, as I said in

9

*People versus Padilla . . .* [¶] . . . [¶] . . . it takes it right from the dictionary. It's some kind of belief that you are seeing something, hearing something . . . that's not there. That's not based on reality. And I don't think fear . . . [is] hallucination. . . . [H]er fear is based on paranoia . . . ."[10] While the trial court ultimately ruled for the defense on the evidentiary point then under discussion, deciding to allow testimony about McCarrick's irrational fear of Paulson as it bore on her diminished actuality defense, it did so only within the confines of the People's legal argument—which incorrectly limited the second prong of *Padilla's* holding to hallucination cases. The court ruled: "I am allowing evidence of hallucination and if part of that—if the argument ultimately is fear induced by these is what caused her to not be able to form the ability to premeditate, that can be the argument, I suppose. *But the evidence will be as to the actual hallucination.*" (Italics added.)[11]

It may be that later, at the close of the guilt phase evidence, when the instructions were argued and settled, it would have been wise for McCarrick's counsel to propose a pinpoint modification to CALCRIM No. 627, making clear that it covers the type of delusions shown by the evidence in this case. But her failure to make such a request should not come at the price of forfeiture. Her substantial rights were affected by the instruction (Pen. Code, § 1259; see *People v. Gray* (2005) 37 Cal.4th 168, 235), and in any event, any effort to seek a modification would likely have been futile. (*People v. Boyette* (2002) 29 Cal.4th 381, 432; see *People v. O'Connell* (1995) 39 Cal.App.4th

---

[10] The prosecution argued "[t]hat is not a hallucination. That is paranoia, but there is a difference. Hallucination is seeing things, hearing things. I mean, it's right in that *Padilla* case.")

[11] The court also ruled, "I am going to allow you to bring in evidence of hallucination on the issue of ability to deliberate and premeditate, but that is as far as it goes." It noted "there is no question that hallucination, evidence of hallucinations can have a bearing and is relevant on the issues of premeditation and deliberation, and that is supported by . . . this *Padilla* case." And again, it said, "I'm going to allow at least a good portion of this evidence, provided it does in fact show the defendant was suffering from hallucinations about this time."

10

1182, 1190 [applying "the principle of law that excuses parties for their failure to raise an issue at trial where to do so would have been an exercise in futility" where defendant failed to request clarifying modification of challenged pattern instruction after trial court had unequivocally rejected legal argument supporting the clarification].) By the time the guilt phase instructions were argued and settled, the trial court had already ruled, unequivocally, and unduly narrowly, in my view, that *Padilla* applies only to hallucinations. Since the court had already announced its interpretation of *Padilla*, McCarrick was not required to seek reconsideration. At that stage, given what the evidence showed—paranoid delusions based on a misperception of actual facts—the court had a sua sponte duty to correct its own error and add clarifying language to make sure the jury understood CALCRIM No. 627 applies to any form of delusionary thinking, including hallucinations.

As the majority points out, neither side drew any distinction between delusions and hallucinations in closing argument. (Maj. opn., *ante*, at p. 20.) But everything that happened after the trial court announced its ruling on the scope of the guilt phase evidence of premeditation and deliberation hinged on the court's narrowly framed ruling. If McCarrick had evidence that she was suffering from "actual hallucinations" (she had none), she was allowed to present it. And if she wanted to argue the hallucination instruction (she had no evidence to do so), she was free to try. Straitjacketed in this manner, counsel did the best she could in closing, attempting to argue to the jury that the hallucination instruction was "very important for you because it's clear that Ms. McCarrick was perceiving things that weren't real." McCarrick should not be penalized on appeal for her counsel's effort to abide by the ground rules the trial court set. (See *People v. Calio* (1986) 42 Cal.3d 639, 643 [" 'An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible.' "].)

11

# V.

The People contend that, by not taking issue with defense counsel's attempt to argue to the jury that McCarrick's delusions qualified as hallucinations, they in effect "resolve[d] [the] ambiguity in favor of" the defense. (*Middleton v. McNeil* (2004) 541 U.S. 433, 438.) To the contrary, they exploited the ambiguity. In response to McCarrick's argument, all the People had to do was point out that there was no evidence of hallucinations, which, predictably, is exactly what they did when they stated, "There is not one piece of evidence that she was under any form of hallucination on October 12, 2010 . . . ." The point was irrefutable. When McCarrick killed her children, she was not seeing imaginary things, or hearing voices, or in a dream-state; she was having real conversations, and reacting to real events, while grossly misreading what was actually happening.

"Jurors are not experts in legal principles; to function effectively, and justly, they must be accurately instructed in the law." (*Carter v. Kentucky* (1981) 450 U.S. 288, 302.) Reversal is required where there is a "reasonable likelihood that the jury misapplied or misconstrued" the trial court's instructions or the underlying law. (*People v. Crew* (2003) 31 Cal.4th 822, 848.) The toxic combination of potentially ambiguous instructions and misleading arguments by the prosecutor requires reversal when it is likely the jury was misled. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 995, 1035–1040; *People v. Roder* (1983) 33 Cal.3d 491, 503–505 & fn. 13.) In their closing reply before the jury, the People's use of the literal terms of CALCRIM No. 627 was warranted, since it was based on the court's announced view of the law—and thus I do not mean to suggest prosecutorial misconduct—but their argument was highly likely to mislead because it invited the jury to give no weight to the evidence of mental disturbance that McCarrick presented.

The resulting prejudice seems plain, whether the instructional error here is viewed as rising to the level of federal constitutional magnitude or simply state law error. While I have no quarrel with the majority's conclusion that the evidence is sufficient to sustain the jury's rejection of McCarrick's sanity phase defense, I cannot agree that "[t]here is no

12

reasonable possibility that the jury interpreted [CALCRIM No. 627] to preclude it from considering defendant's delusions" at the guilt phase. (Maj. opn., *ante*, at p. 21.) In my view, it is not only reasonably possible CALCRIM No. 627 short-circuited McCarrick's guilt phase defense in that way, it is "reasonably probable [she] would have obtained a more favorable result in the absence of error." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

The most intuitive, everyday understanding of the term "hallucination," as evidenced by the dictionary definitions quoted in *Padilla*, is that it is limited to a situation in which a person perceives something with no objective reality. Perhaps this jury rejected McCarrick's guilt phase defense on the merits for lack of credibility after concluding that whatever mental disturbance she suffered from in the weeks before the killings was transient and had dissipated by the day of the crimes, which is one reading of the People's final pitch in their closing reply. More likely—because the evidence overwhelmingly points to profound, longstanding mental illness here, even if McCarrick was sane in the *M'Naghten* sense—that defense failed on a point of semantics: She suffered from delusions, not from hallucinations.

Accordingly, I join in Sections I and II.B of the majority's opinion, but must respectfully dissent from Section II.A.


_____

Streeter, J.

13

| | |
|---|---|
| Trial Court: | Solano County Superior Court |
| Trial Judge: | Honorable Peter B. Foor |
| Counsel for Appellant: | James Kyle Gee, under appointment by the First District Appellate Project |
| Counsel for Respondent: | Kamala D. Harris, Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Joan Killeen, Deputy Attorney General |