Filed 2/3/23 P. v. Lopez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>EDDIE AYON LOPEZ,<br><br>    Defendant and Appellant. | F082551<br><br>(Super. Ct. No. PCF373225)<br><br>**MODIFICATION OF OPINION AND DENIAL OF REHEARING [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion herein filed on January 17, 2023, be modified as follows:

1.  On page 20, insert the following at the end of the first partial paragraph:

(See *People v. Earp* (1999) 20 Cal.4th 826, 886 [the trial court must give jury instructions, upon request, " 'that "pinpoint[] the theory of the defense" ' "].)

2.  On page 20, strike the first full paragraph preceding the heading "***ii. Prejudice***" and replace it with the following:

Based upon the nature of his arguments, Lopez appears to advance a new theory supporting his request for CALCRIM No. 627 on appeal, adopting the theory discussed by the trial court in *McCarrick*. We will presume, without deciding, that the record contains substantial evidence to support the requested instruction upon this theory, and that the trial court erred by refusing the requested instruction. For the reasons discussed below, we conclude that Lopez has failed to show prejudice from the trial court's presumed error.

3. On page 23, in the second sentence of the second paragraph, strike the words "was unable" and insert "failed" in their place so the sentence reads as follows:

   While Lopez was demonstrating bizarre and impulsive behavior, there is insufficient evidence to conclude that he failed to premeditate or deliberate, either because he was provoked to kill G.C. based upon his delusion, or because he was in a state of mind that precluded him from forming premeditation and deliberation.

This modification does not effect the judgment.

The petition for rehearing is denied.

SMITH, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DE SANTOS, J.

Filed 1/17/23 P. v. Lopez CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EDDIE AYON LOPEZ,<br><br>Defendant and Appellant. | F082551<br><br>(Super. Ct. No. PCF373225)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County. Michael B. Sheltzer, Judge.

Jonathan D. Roberts, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant Eddie Ayon Lopez was convicted by jury of premeditated attempted murder (Pen. Code,[1] § 664/187, subd. (a), count 1), kidnapping (§ 207, subd. (a), count 2), domestic violence (§ 273.5, subd. (a), count 3), assault with a deadly weapon (§ 245, subd. (a)(1), count 4), criminal threats (§ 422, count 5), false imprisonment (§ 236, count 6), misdemeanor battery (§ 242, count 7) and carjacking (§ 215, count 8). In addition, the jury found true multiple enhancement allegations, including an enhancement for the use of a firearm in the commission of the attempted murder (§ 12022.53, subd. (b)). Lopez was sentenced to an aggregate prison term of life with the possibility of parole, plus 30 years.

On appeal, Lopez contends (1) the trial court erred by refusing his request to instruct the jury on CALCRIM No. 627, and the jury's true finding on the premeditation and deliberation enhancement must be reversed; (2) Lopez's sentence on count 2 should have been stayed pursuant to section 654; and (3) he is entitled to remand for a full resentencing because of the passage of intervening legislation, including: Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Assembly Bill No. 124), Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill No. 518), and Senate Bill No. 567 (2021-2022 Reg. Sess.) (Assembly Bill No. 567). In supplemental briefing, Lopez further contends he is entitled to resentencing following our Supreme Court's decision in *People v. Tirado* (2022) 12 Cal.5th 688, because the trial court was unaware of the scope of its discretion with respect to the firearm use enhancement (§ 12022.53, subd. (b)).

The Attorney General concedes that remand for resentencing is required based upon the enactment of new legislation. However, he maintains that the jury's finding of premeditation and deliberation on Lopez's attempted murder conviction should be affirmed because the pinpoint instruction requested was not warranted, and the trial

---

[1] All undefined statutory citations are to the Penal Code unless otherwise indicated.

court's refusal to give the instruction was not prejudicial. We agree that resentencing is required based upon the passage of new legislation and will therefore remand the matter back to the lower court for a full resentencing hearing (see *People v. Buycks* (2018) 5 Cal.5th 857, 893). We otherwise affirm.

## PROCEDURAL HISTORY

On January 4, 2019, the Tulare County District Attorney's Office filed an information charging Lopez with premeditated attempted murder (§ 664/187, subd. (a), count 1), kidnapping (§ 207, subd. (a), count 2), domestic violence (§ 273.5, subd. (a), count 3), assault with a deadly weapon (§ 245, subd. (a)(1), count 4), criminal threats (§ 422, count 5), false imprisonment of G.C. (§ 236, count 6), misdemeanor battery (§ 242, count 7) and carjacking (§ 215, subd. (a), count 8). In addition, enhancement allegations were alleged for the use of a firearm in the commission of a specified felony (§§ 12022.53, subd. (b) [counts 1, 2, 8], the personal use of a firearm (§ 12022.5, subd. (a)(1) [counts 3-6]), causing great bodily injury (§ 12022.7, subd. (e) [counts 1-6, 8], and an on-bail enhancement (§ 12022.7, subd. (e) [counts 1-6, 8]).

On January 31, 2020, following a jury trial, Lopez was found guilty on all counts. The jury also found true all enhancement allegations, with the exception of the firearm use enhancement alleged as to count 2.[2]

On February 25, 2021, Lopez was sentenced to a prison term of life with the possibility of parole plus a consecutive determinate term of 30 years.

On March 19, 2021, Lopez filed a timely notice of appeal.

## STATEMENT OF FACTS

On November 18, 2018, Lopez departed from his parents' Earlimart home in his father's Honda. Lopez's wife, G.C., their infant son, B.E., and Lopez and G.C.'s mutual friend, A.A., accompanied him.

---

[2] Not all of the enhancements alleged in the allegation were submitted to the jury.

3.

On November 20, 2018, Lopez arrived at the home of Y.I., his ex-girlfriend and the mother of his two daughters. Lopez left the baby with Y.I. and then fled. G.C., beaten, bloody, and in and out of consciousness, flagged down a passing car.

The witnesses' version of events differentiated substantially from one another, as well as their own pretrial statements to police. We do not identify these discrepancies throughout this factual summary because they are not directly relevant to the issues raised in this appeal. In any event, we are required to draw all factual inferences in favor of the judgment on appeal. (See generally, *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

### The Prosecution's Case

Lopez lived with his parents, L.L. and E.A. in Earlimart. On the evening of November 18, 2018, L.L. contacted law enforcement to report that Lopez had taken L.L.'s car following a physical altercation. According to L.L., Lopez appeared to be under the influence of something.

Deputy Kevin Flaherty with the Tulare County Sheriff's Department was dispatched to L.L. and E.A.'s residence. Through a Spanish language translation service, L.L. explained that Lopez wanted to use L.L.'s vehicle, which resulted in a verbal argument that escalated into a physical confrontation.

During the confrontation, L.L. pushed Lopez to the ground. Lopez got up, retrieved a kitchen knife, and chased L.L. with the knife to the outside of the residence and into the front yard. Fearful that Lopez would stab L.L., E.A. threw Lopez the keys to L.L.'s vehicle. Lopez left with his wife, G.C., and their baby, B.E.

#### G.C.'s Testimony

After departing from Lopez's parents' home, Lopez began driving north to G.C.'s father's home to drop her off. Lopez had been recently shot at and was concerned for the safety of G.C. and B.E.

4.

At some point during the trip, Lopez became angry with G.C. and he accused her of infidelity. Lopez began hitting G.C.'s legs and face with his fists.

Lopez subsequently turned the car around to pick something up. He eventually stopped at a Carl's Jr. fast food restaurant. G.C. asked A.A. for help, but A.A. refused. During this time, the child safety locks on the backseat doors were activated, preventing G.C. from escaping.

Lopez covered the windows of the vehicle with a blanket or a sunscreen. He refused to let G.C. out of the car. Lopez told G.C., " 'I'ma kill you.' " They stayed at the Carl's Jr. parking lot for two hours. G.C. told law enforcement that during this time, Lopez hit her with the butt of a gun.

During the drive, Lopez choked G.C. to the point of unconsciousness. When they reached a gas station, Lopez told her to get out, but G.C. refused to leave the baby. Lopez began to punch G.C.

After they left the gas station, Lopez arrived at Y.I.'s home in Earlimart. Lopez went to Y.I.'s home to pick up a gun to kill G.C. Lopez told G.C. that he was going to leave the baby with Y.I. and that G.C. would never see the baby again.

When they arrived at Y.I.'s home, Lopez got out of the vehicle and gave Y.I. the baby. G.C. jumped into the driver's seat and attempted to drive the vehicle, but A.A. turned the car off. G.C. asked A.A. for help, but A.A. told G.C. that she could not leave. As Lopez started running back to the car, G.C. locked the doors. A.A. unlocked the doors.

G.C. got out of the car as another vehicle passed by. G.C. asked for help, but Lopez told the driver that G.C. "was crazy." The driver left. Lopez grabbed G.C. by the back of her neck, threw her into the back of the vehicle, and began hitting her. She told law enforcement that Lopez also hit her with a gun. Lopez told G.C. he was going to kill her.

Another vehicle passed by. Lopez believed that the driver was calling the police, so he fled on foot.

G.C.'s uncle took her to the hospital and they contacted law enforcement. G.C. was in and out of consciousness and needed stitches to her forehead and head. She had also lost a front tooth from the beatings she endured, and she had suffered cuts and bruises to her arms and legs, as well as a "severe black eye."

### G.C.'s Statements to Police

Deputy Eric Barajas with the Tulare County Sheriff's Department responded to the Delano Hospital, where G.C. was admitted.

G.C. was bleeding heavily and was in and out of consciousness. G.C. told Deputy Barajas that Lopez had assaulted her with the butt end of a firearm. According to G.C., this occurred in Earlimart and in Fresno. G.C. also stated that while they were in Earlimart, Lopez had strangled her until she lost consciousness. G.C. explained that she was missing a tooth because Lopez had shoved the gun into her mouth while they were in Earlimart.

Detective Scott O'Neill with the Tulare County Sheriff's Department also interviewed G.C. at the hospital. G.C. told Detective O'Neill that Lopez had started hitting and threatening her with a brown revolver when they got to a truck stop, possibly in Madera. He also struck her in the head with the handle of the revolver while in a Carl's Jr. parking lot. G.C. stated she was missing her front tooth because as they were traveling back from Earlimart, Lopez shoved the gun into her mouth. Lopez also hit her with the butt of the gun while in Earlimart.

### A.A.'s Testimony

At some point during the drive from Earlimart, G.C. and Lopez became upset with each other, and Lopez accused G.C. of cheating. Lopez was also very concerned about G.C. doing black magic that would harm the baby. A.A. explained that she was friends with G.C.'s mother and knew that G.C.'s mother and G.C. practiced black magic. A.A.

6.

explained that she had received a message on her phone from G.C.'s mother during the drive stating that she was sentencing Lopez and A.A. to " 'holy dead.' "

While they were parked in the Carl's Jr. parking lot, Lopez punched and slapped G.C. Lopez also put up blankets and the windshield sunscreen and said something about "taking care" of them, which A.A. interpreted as a threat.

During the drive from Carl's Jr. to Earlimart, Lopez began to say "some really crazy things." He was getting progressively more upset thinking that G.C. was into black magic. Lopez hit G.C. a few times while he was driving. A.A. was holding the baby in her arms in the front seat of the vehicle.

When they arrived at Y.I.'s house in Earlimart, the vehicle ran out of gas. After Lopez exited the car, G.C. got into the front seat and attempted to start the vehicle. Lopez ran back to the car and pulled G.C. outside. He started hitting G.C. G.C. tried to run away and flag down a car, but the car kept driving. Lopez held G.C. by the torso and dragged her back to the car. Lopez eventually ran away and G.C. ran off too, telling A.A. to take care of her baby.

### The Defense Case

Lopez testified in his defense at trial. He claimed that on November 18, 2018, at approximately 5:00 or 6:00 p.m., he heard gunshots as he was driving home. When he examined his vehicle, he found two or three bullet holes in the side of his car. Lopez, a dropout of the Norteño criminal street gang, became concerned for his safety and the safety of his children. According to Lopez, the gang had previously sought retribution against him, leaving at least 16 bullet holes in his father's car.

When Lopez arrived home, he told his father he had to get his child out of the house. Lopez's father gave Lopez the keys to his vehicle. Lopez put G.C. and his son into the car and departed. They drove to G.C.'s cousin's house in McFarland and spent the night.

Lopez denied threatening anyone with a knife. He claimed that he took a kitchen knife for his protection because he did not have a gun. Lopez further claimed that G.C. left with him voluntarily.

Lopez called Y.I. because he was scared something might happen to her or his daughters. He told G.C. he was going to Earlimart, but G.C. hid his car keys. They left G.C.'s cousin's house the following morning and went to A.A.'s house in Pixley. While at A.A.'s house, Lopez decided to take G.C. to her father's home in Ukiah. They agreed to leave that night so their son could sleep on the drive there.

At 7:00 or 8:00 p.m., Lopez, G.C., their baby, and A.A. left A.A.'s house. Lopez denied taking a gun with him.

At approximately 10:00 p.m. or 11:00 p.m., Lopez stopped in Tulare so they could get food and to visit a Ross clothing store so that they could purchase clothes for the baby.

Lopez drove all the way up to Sacramento. During the trip, he stopped at three different rest stops.

While at the second rest stop, a man asked Lopez what he was smoking. Lopez offered the man a cigarette, but the man started "acting up." This agitated Lopez and gave him a "bad vibe." He "felt something going through [his] body."

When Lopez told G.C. and A.A. about this, he saw G.C. "smiling like if there was something up." G.C. began acting peculiar. Lopez began worrying about his two daughters after a song by Eminem came on the radio. He looked back at G.C. She had the baby's blanket over her head and had "some crazy looking eyes on her face."

Lopez then said to her, " 'It's you, huh?' " He felt like "she was trying to [do] something evil or possessed" to their baby. He asked A.A. to get the baby from the back seat and then he started touching the baby with a necklace of the Virgin Mary, causing the baby to smile. After that, Lopez did not feel that the baby was safe with G.C. G.C.

8.

told Lopez that he was crazy, but he replied that she and her mother were crazy. At this point they were "almost close to Sacramento."

Lopez pulled over at the third rest stop which was near Sacramento and told G.C. "to get … out [of the] car" several times. She refused. He told her to stop doing whatever "crazy shit" she was doing because it was "tripping [him] out." G.C. refused to leave.

At some point after Lopez began to believe that something was wrong with his oldest daughter, he turned the car around and began driving back to Earlimart, to the home of his daughters' mother, Y.I.

On the way, Lopez pulled over at a gas station and ordered G.C. to get out of the car. When she laughed, he beat her with his fists a few times. Lopez explained that he felt like G.C. was "threatening [his] kids." He denied beating her with the butt of a gun or having guns with him at all during the trip.

Lopez grabbed his knife and carved his oldest daughter's name into his chest. He thought this would protect his daughter against the "black magic, witchcraft that [was] coming from the devil." He testified, "I believed that if I shed[] her blood,[3] none of … [what G.C.] was trying to do was going to touch her [i.e., his daughter]." Lopez denied striking G.C. with anything other than his hands, and he denied trying to kill her.

At approximately 3:00 a.m., at a Carl's Jr. fast food restaurant in Fresno, Lopez covered up the windows of the car because "[G.C.'s] evil-looking face still hadn't changed." They stayed there for two hours.

When he arrived at Y.I.'s home, Lopez told Y.I. to let him see his daughters and to take care of B.E. because he felt like G.C. was endangering the baby with "weird shit" that he could not see. Lopez then left on foot.

---

**3** It appears Lopez intended to state that if he shed *his* blood, it would protect his daughter from G.C.'s black magic.

According to Lopez, G.C. never tried to flee the car, so Lopez denied dragging her back into the car. He also denied threatening to kill her. Lopez claimed that he wanted G.C. to get out of the car. Although Lopez admitted hitting G.C. with his bare hands while at a gas station, he denied hitting her with a gun or having a gun in his possession during any portion of the trip. He further claimed that the keys were in the vehicle every time he got out, such that G.C. could have driven away.

Lopez believed that G.C. had been cheating on him, but he claimed that this did not bother him. He stated that he was not going to force her to be with him.

## DISCUSSION

### I. The Trial Court Did Not Prejudicially Err by Refusing the Requested Pinpoint Instruction

Lopez was convicted of the premeditated attempted murder of G.C. He contends the trial court reversibly erred by refusing his request to instruct the jury with CALCRIM No. 627, which pertains to the effect of hallucinations to negate premeditation and deliberation. Lopez argues the court's failure to instruct the jury accordingly was prejudicial because the instruction would have allowed the jury to find the premeditation allegation was not true. We find no error, nor error assuming prejudice.

### A. Background

At trial, Lopez admitted hitting G.C., but he denied attempting or threatening to kill her, kidnapping her, or possessing a firearm. He also denied being under the influence of any substances, and there was no evidence showing that he suffered from some kind of mental defect or disorder which might cause psychotic symptoms, such as delusions. Consistent with Lopez's representations, trial counsel appeared to be seeking an acquittal of the most serious charges by arguing Lopez had only hit G.C.

During trial, trial counsel asked the court to instruct the jury on CALCRIM Nos. 603 [Attempted Voluntary Manslaughter] and 627 [Hallucination: Effect on Premeditation].

CALCRIM No. 627 states the following:

10.

"A hallucination is a perception not based on objective reality. In other words, a person has a hallucination when that person believes that he or she is seeing or hearing [or otherwise perceiving] something that is not actually present or happening.

"You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation.

"The People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

The trial court deferred consideration of the requested instructions. At the time, it was unclear whether Lopez, who might offer evidence that he was operating under a delusion or hallucination, would testify.

After the evidentiary portion of the trial concluded, the parties discussed the jury instructions requested by trial counsel. The prosecutor stated that Lopez had requested the jury be instructed pursuant to CALCRIM No. 603, an instruction on attempted voluntary manslaughter. The prosecutor opposed the instruction because there had been no evidence supporting the conclusion that Lopez had been provoked to kill G.C.

The trial court asked trial counsel whether he was also requesting CALCRIM No. 627. Trial counsel responded affirmatively. Trial counsel explained that the instruction was warranted because Lopez was operating under a delusional belief that G.C. was practicing black magic, which could harm the children. And, based upon this delusion, Lopez was provoked to act irrationally and without deliberation in attempting to kill G.C. The court stated that it needed to conduct further research on the issue.

When the parties reconvened, the trial court explained that based upon trial counsel's asserted theory, it was going to deny counsel's request for CALCRIM No. 603. The court observed that "a hallucination[] cannot arouse the passion of an ordinarily reasonable person," which foreclosed trial counsel's ability to argue that the attempted

11.

murder charge could be mitigated to attempted voluntary manslaughter based upon a purely delusional belief.

The prosecutor observed that a delusion or hallucination could affect the special allegation of deliberation and premeditation, and the trial court agreed. The parties discussed whether there was any evidence that Lopez had experienced a hallucination. Notwithstanding Lopez's testimony about G.C.'s "crazy eyes," the prosecutor asserted that no such evidence had been introduced. He added that while Lopez's delusional belief may have been the motivation for the attempted murder, it did not undercut the evidence of premeditation or deliberation.

Trial counsel replied that Lopez's belief "gives rise to a spontaneous act which degrades the whole concept of premeditation."

The trial court turned to the Cambridge dictionary for the following definition: " 'A delusion in psychology is a rigid system of beliefs with which a person is preoccupied and to which a person firmly holds, despite the logical absurdity of believes and lack of supporting evidence. Delusions are symptomatic of such mental disorders such as schizophrenia, paranoia, major depression, and a psychological condition as senile psychosis and delirium.' " The court denied trial counsel's request for the pinpoint instruction, explaining:

> "[THE COURT:] I think that on balance, the Court is going to reject the instruct[ion] for the following reasons: I don't think there was any evidence that what the defendant was perceiving is either a hallucination or delusion as defined. I think that in order to establish a delusion, it requires expert testimony. It's a factual issue whether or not he was suffering from delusions. He's explained what he saw or believes what he saw, but what is the proof that he was suffering from a delusion and/or hallucination?
>
> "[DEFENSE COUNSEL]: There is no proof. The reality is that if you take the religious approach to that, is there actually a devil? Is that a delusion? Is that a hallucination? I don't know. I mean, I'm trying to look at it from a perspective of is there a plausible

explanation for his conduct, and is it covered by any of the jury instructions. My position is, yes. The Court feels that that requires expert testimony. That's its position.

"THE COURT: I certainly -- the reason I'm spending as much time as I am on this is because I do understand what your theory of a defense is, and I'm just not seeing that the evidence is there to establish it. I've got to make a ruling. I've got to get the jury back in here. That's my ruling. Right or wrong. I think it's right."

## B.      Legal Principles

Evidence that a defendant was hallucinating or delusional is inadmissible to negate his or her capacity to form any mental state. (§ 28, subds. (a)-(b); *People v. Saille* (1991) 54 Cal.3d 1103, 1112 [discussing the abolition of diminished capacity].) Evidence of a purely delusional belief is also inadmissible to negate malice, reducing the crime of murder to voluntary manslaughter based upon unreasonable self-defense or heat of passion.

Unreasonable self-defense is " 'a shorthand description of one form of voluntary manslaughter.' " (*People v. Elmore* (2014) 59 Cal.4th 121, 134 (*Elmore*).) Under this theory, "defendants who mistakenly believed that actual circumstances required their defensive act may argue they are guilty only of voluntary manslaughter, even if their reaction was distorted by mental illness." (*Id.* at p. 146.) However, unreasonable self-defense does not apply "when belief in the need to defend oneself is entirely delusional." (*Id.* at p. 130.) Unreasonable self-defense must be predicated upon "a misperception of objective [facts], not a reaction produced by mental disturbance alone." (*Id.* at p. 134.) This is because "a mistake of fact is predicated upon a negligent perception of facts, not, as in the case of a delusion, a perception of facts not grounded in reality." (*Id.* at p. 136.)

Likewise, a purely delusional belief cannot preclude the formation of malice based upon a heat of passion or provocation theory. The test for provocation or heat of passion that reduces murder to voluntary manslaughter is objective. The facts and circumstances

13.

provoking the defendant must therefore be " 'sufficient to arouse the passions of the ordinarily reasonable [person.]' " (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678 (*Padilla*); *People v. Saille*, *supra*, 54 Cal.3d at p. 1114.) Accordingly, a defendant who experienced hallucinations or delusions which prompted them to kill is not entitled to a voluntary manslaughter instruction based on heat of passion or provocation aroused by the hallucination or delusion. "A perception with no objective reality cannot arouse the passions of the ordinarily reasonable person." (*Padilla,* at p. 679.)

Evidence that a defendant was experiencing a hallucination or a delusion that prompted him or her to kill may however be admitted to negate premeditation and deliberation, as that test is subjective. (*Padilla*, *supra*, 103 Cal.App.4th at p. 679; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295 [whether provocation precluded the defendant from deliberating and premeditating depends on the defendant's *subjective* state of mind]; *People v. Wickersham* (1982) 32 Cal.3d 307, 329, quoting *People v. Valentine* (1946) 28 Cal.2d 121, 132 [" '[The] existence of provocation which is not "adequate" to reduce the class of the offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation' "].)

Lopez was charged with attempted murder with a penalty enhancement for premeditation and deliberation. A decision to kill is "premeditated" if considered beforehand and "deliberate" if resulting from careful thought and weighing of competing considerations. (*People v. Lee* (2011) 51 Cal.4th 620, 636.) The required extent of reflection may occur quickly. (*Ibid.*) "A finding of deliberation and premeditation is not negated by evidence [showing that] a defendant's mental condition was abnormal or his perception of reality delusional unless those conditions resulted in the failure to plan or weigh considerations for and against the proposed course of action." (*People v. Stress* (1988) 205 Cal.App.3d 1259, 1270 (*Stress*); accord, *People v. Bobo* (1990) 229 Cal.App.3d 1417, 1434, review granted Oct. 11, 1990 (S016988), opinion superseded and publication ordered Dec. 11, 1991.)

CALCRIM No. 627, the instruction requested by trial counsel, is a pinpoint instruction that assists the jury in determining whether the defendant acted with deliberation and premeditation when there is evidence of a hallucination or delusion. CALCRIM No. 627 must be given on request when the evidence supports the theory. (*People v. McCarrick* (2016) 6 Cal.App.5th 227, 243 (*McCarrick*).)

" 'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt." ' [Citation.] 'On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence — evidence that, if believed by a rational jury, would have raised a reasonable doubt as to' an element of the crime in question." (*People v. Mitchell* (2019) 7 Cal.5th 561, 583, citing *People v. Mentch* (2008) 45 Cal.4th 274, 288.)

### C.  Analysis

#### 1.  *Error*

The definition of a hallucination and a delusion is often blurred. A hallucination is "a perception with no objective reality" or a " '[p]erception of visual, auditory, tactile, olfactory, or gustatory experiences without an external stimulus.' " (*Padilla*, *supra*, 103 Cal.App.4th at p. 678, italics omitted.) Whereas, a delusion is " 'something that is falsely or delusively believed or propagated ... as ... a false conception and persistent belief unconquerable by reason in something that has no existence in fact [or] a false belief regarding the self or persons or objects outside the self that persists despite the facts.' " (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1453, fn. 22.)

Lopez contends, and we agree, that there was evidence showing that during portions of the two-day incident, he was under the delusion that G.C. was practicing

black magic, and that he believed he and the children were in danger.[4] He further contends that expert testimony was not required to establish that he was experiencing a delusion. The Attorney General does not explicitly contest this assertion. We agree that expert testimony was not required to establish whether Lopez was experiencing a delusion.

"The chief value of an expert's testimony ' "rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion." ' " (*McCarrick, supra*, 6 Cal.App.5th at p. 247.) While an expert's testimony may assist the trier of fact in understanding the significance of certain facts, thereby bolstering a defendant's claim that he was experiencing and reacting to a delusion, a defendant's testimony alone could be sufficient to show as much. "Even if it does not inspire confidence, a defendant's testimony constitutes substantial evidence." (*People v. Mejia-Lenares, supra,* 135 Cal.App.4th at p. 1446.)

The Attorney General contends that it is not enough for a defendant to show they were experiencing a delusion; the defendant must also adduce evidence showing that his or her decision to kill was a direct and immediate response to provocation, i.e., the delusion, such that the defendant acted without premeditation and deliberation. According to the Attorney General, the pinpoint instruction was not warranted because there was no evidence that Lopez's decision to kill was a direct and immediate response to the delusion, such that he acted without planning. Lopez responds as follows: "a hallucination can exist without creating a provocation, but still interfere with premeditation and deliberation."

Lopez fails to direct us to any legal authority which directly supports his assertion. Further, the vast majority of the authority we have found which addresses this issue

---

**4** Lopez testified that G.C. had "crazy eyes," but the record does not permit us to conclude that he was experiencing a hallucination from his ambiguous description.

16.

pertains to defenses based upon mental defects or disorders, and not simply hallucinations, which can be the byproduct of a mental defect or disorder. Lopez does not suggest that there is any evidence in the record which would have supported a mental defense, such as diminished actuality.[5]

Assuming Lopez is correct that no act of provocation is needed to support a request for CALCRIM No. 627, that is not the defense trial counsel articulated in support of his request for the instruction. The pinpoint instruction requested by trial counsel as an alternative defense pertained to a delusion which *provoked* Lopez to attempt to kill G.C. As trial counsel explained, evidence of the delusion gave "rise to a spontaneous act which degrades the whole concept of premeditation."

As we understand trial counsel's argument, if the jury rejected Lopez's testimony that he did not kidnap, threaten, or attempt to kill G.C., resulting in an acquittal of the most serious charges, then it could potentially find he was provoked to kill G.C. based upon his delusional belief that she was practicing black magic.[6]

---

[5] Diminished actuality is not based upon a provocative delusion, nor is this defense limited to the jury's finding of premeditation and deliberation. Under this theory, " 'evidence of mental disorders is admissible 'on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged.' " (*Elmore*, *supra*, 59 Cal.4th at p. 139.) Here, trial counsel did not adduce evidence showing Lopez suffered from an organic or substance-induced mental disorder which might support a diminished-actuality defense. In light of Lopez's psychological evaluation, which failed to establish evidence of a mental defect or disorder, and his testimony denying that he was under the influence of a controlled substance, we presume this was because such evidence was not available.

[6] Trial counsel technically asserted that the provocative act occurred when G.C. laughed at Lopez after he accused her of practicing black magic. Thus, the provocative act was not the delusion, but G.C.'s reaction to Lopez's accusation. The trial court subsequently reframed trial counsel's defense as follows: "your theory is that his perception that … [G.C.] was practicing black magic was sufficient provocation for him to act irrationally and without due deliberation in his attempt to kill her … is that what your argument is?" Trial counsel responded affirmatively but with hesitation, adopting the trial court's theory.

17.

Our conclusion is bolstered by the fact that in addition to CALCRIM No. 627, trial counsel also requested the jury be instructed pursuant to CALCRIM No. 603, attempted voluntary manslaughter. That instruction applies, in relevant part, where "[t]he defendant attempted to kill someone because of a sudden quarrel or in the heat of passion." (CALCRIM No. 603.) Trial counsel was attempting to present an alternative defense showing that if Lopez had attempted to kill G.C., he did so without premeditation and deliberation, provoked by the delusion. Because Lopez's delusion existed only in his mind, CALCRIM No. 603 was correctly denied by the trial court. A defendant prompted by an entirely delusional belief cannot, as a matter of law, mitigate murder to voluntary manslaughter. (*Padilla, supra,* 103 Cal.App.4th at p. 679; *Elmore*, *supra*, 59 Cal.4th at p. 137 ["[u]nreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind"].)

There was insufficient evidence showing that Lopez, provoked by his delusion, " 'formed the intent to kill as a direct response to the provocation and acted immediately.' " (*People v. Fitzpatrick, supra,* 2 Cal.App.4th at p. 1296, quoting *People v. Wickersham* (1982) 32 Cal.3d 307, 329.) Although there was evidence Lopez was operating under a delusional belief during portions of the two-day incident, a finding of premeditation and deliberation "is not dependent [up]on the motivation for the act. Nor is the necessary mental process lacking when the considerations reflected on by the defendant were the product of mental disease or defect." (*Stress, supra,* 205 Cal.App.3d at pp. 1270-1271.)

Further, nothing within the record shows that Lopez's delusional perception of reality "resulted in the failure to plan or weigh considerations for and against the proposed course of action." (*Stress, supra,* 205 Cal.App.3d at p. 1270; *People v. Thomas* (1992) 2 Cal.4th 489, 519 [" 'A senseless, random, but premeditated, killing supports a verdict of first degree murder' "].) Based upon these considerations, we conclude that the trial court correctly denied trial counsel's requested pinpoint instruction.

18.

Lopez insists that *McCarrick*, *supra*, 6 Cal.App.5th 227 supports the conclusion that CALCRIM No. 627 should have been given. *McCarrick* is minimally helpful to Lopez's argument.

There, McCarrick killed her twin daughters, motivated by the delusion that they were in imminent peril of being kidnapped and tortured, and that murder was the only alternative to save them from a worse fate. (*McCarrick*, *supra*, 6 Cal.App.5th at p. 244.) The evidence did not suggest that McCarrick was acting irrational on the day of the murders, and she had admitted that she had planned to kill the girls two days prior to doing so. (*Id.* at p. 248.) There was also no evidence of a specific act of provocation. However, three mental health professionals that had evaluated McCarrick opined that her mental disorder played a role in her actions on the night of the murders, and that her actions were a product of her mental disorder and her defective reasoning. (*Id.* at pp. 236-237, 240-241.) The trial court admitted evidence of McCarrick's hallucinations because, according to the court, the fear induced by the hallucinations could have foreclosed McCarrick from forming the ability to premediate and deliberate. (*Id.* at pp. 244-245.)

The issue in *McCarrick* was not whether CALCRIM No. 627 should have been given, but whether CALCRIM No. 627, as given, precluded the jury from considering the effect of psychotic delusions other than sensory hallucinations. (*McCarrick*, *supra*, 6 Cal.App.5th at p. 242.) Whether the pinpoint instruction was appropriate upon the facts presented was not challenged on appeal. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7.)

*McCarrick* is also distinguishable from the instant case based on the asserted defense that supported the pinpoint instruction. There, the trial court admitted evidence of McCarrick's hallucinations to show that the fear induced by her delusional beliefs rendered her incapable of forming premeditation and deliberation. (*McCarrick*, *supra*, 6 Cal.App.5th at p. 244-245.) Here, trial counsel's alternative defense was not that Lopez

was foreclosed from forming premeditation and deliberation because he was in a persistent state of agitation or fear induced by the delusion, but that the delusion provoked him to try to kill G.C. Lopez's assertion that the pinpoint instruction went to the heart of his defense is therefore not supported by the record.

Lopez appears to be advancing a new theory supporting his request for the instruction on appeal, adopting the theory discussed by the trial court in *McCarrick*. The trial court must give jury instructions, upon request, " 'that "pinpoint[] the theory of the defense." ' " (*People v. Earp* (1999) 20 Cal.4th 826, 886.) The court is not required to give jury instructions that pinpoint any theory the defense could conceivably have argued. We therefore conclude that trial counsel's request for the pinpoint instruction was properly denied based upon the defense asserted by trial counsel.

### ii.    *Prejudice*

Assuming the trial court had a duty to instruct that Lopez's delusion could negate the deliberation and premeditation required for the attempted murder penalty allegation, any error was harmless.

We review for prejudice under the test in *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Beltran* (2013) 56 Cal.4th 935, 955 [error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof is reviewed for prejudice under the test in *Watson*].) Under *Watson*, " 'defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*Ibid.*) "Further, the *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Id*. at p. 956.)

The prosecutor asserted that the motive for the attempted murder and other crimes perpetrated by Lopez was based upon Lopez's belief that G.C. was cheating on him. Trial counsel argued that the motive for any crimes that may have occurred "had something to do with black magic." Assuming Lopez's motivation for the attempted murder was based entirely upon his delusional belief that G.C. was practicing black magic that could harm the children, that did not foreclose the jury from finding he acted with premeditation and deliberation. A defendant can still premeditate and deliberate within the context of a delusion:

> " 'A finding of deliberation and premeditation is not negated by evidence a defendant's mental condition was abnormal or his perception of reality delusional *unless* those conditions resulted in the failure to plan or weigh considerations for and against the proposed course of action. The mental process necessary for a finding of deliberation and premeditation is not dependent on the motivation for the act. Nor is the necessary mental process lacking when the considerations reflected on by the defendant were the product of mental disease or defect.' " (*Stress*, *supra*, 205 Cal.App.3d at pp. 1270-1271.) (Emphasis added.)

"[D]eliberation exists even if the considerations that the defendant weighs are irrational or insane." (*Maria v. Muniz* (9th Cir. 2017) 704 Fed.Appx. 641, 643; *People v. Bobo*, *supra*, 229 Cal.App.3d at p. 1435, review granted Oct. 11, 1990 (S016988), opinion superseded and publication ordered Dec. 11, 1991 ["a delusional, psychotic system can be compatible with the premeditation and deliberation required for a first degree murder"].) The question is whether the delusion precluded the defendant from deliberating. (*People v. Fitzpatrick, supra,* 2 Cal.App.4th at p. 1295.)[7]

---

[7] In the same vein, the fact that the defendant has a mental disorder or defect is not sufficient, alone, to negate premeditation and deliberation. For example, certain mental diseases or defects, such as paranoid schizophrenia, can impair the ability to premeditate and deliberate because it profoundly affects the afflicted person's perception of reality and causes a disorganized and confused thought process. However, a person afflicted

21.

Contrary to Lopez's assertion, *People v. Stress, supra,* 205 Cal.App.3d 1259 is instructive. In *Stress*, the defendant suffered from a paranoid delusional psychosis. (*Id.* at p. 1266.) Stress became obsessed with a delusional belief that professional athletic leagues were conspiring with television networks and the federal government to prevent professional athletes from being drafted into service in Vietnam. He killed his wife so that he could gain the national platform he needed to expose the conspiracy. (*Id.* at pp. 1262-1263.) Despite the existence of evidence showing Stress suffered from a paranoid disorder, the appellate court found strong evidence showing Stress had willfully, deliberately, and with premeditation, killed his wife. (*Id.* at pp. 1264-1265, 1267.)

Here, as in *Stress*, although Lopez was delusional and his behavior was erratic, there was evidence of premeditation and deliberation. As the prosecutor explained in closing argument, "[Lopez] had several hours to deliberate, plan, and put his plan into action." During the car ride, Lopez told G.C. he was going to "take [her] life," that he was going to leave the baby with Y.I., and G.C. "was never going to see him again." He also shoved a gun into G.C.'s mouth and strangled her, he kept her locked in the vehicle, and he beat her so severely that she lost a tooth, needed stitches, and was in and out of consciousness.

Lopez told G.C. he was going to Y.I.'s house to retrieve a gun "[t]o kill [her]." When he arrived at Y.I.'s house, he handed the baby to Y.I. Lopez threw G.C. into the backseat after she tried to flee, he beat her, and told her he was going to kill her. He only stopped when he was interrupted by a passing motorist, whom he believed, was going to call the police.

---

with such a disease or defect *can* make decisions that are based on reality and act on those decisions without being influenced by their mental illness. Like a mental defect or disorder, the fact that a defendant experienced a delusion which prompted him or her to kill is not necessarily sufficient to show that the defendant's ability to premeditate and deliberate was impaired.

Although the precise sequence of events is difficult to discern from the record, the evidence adduced at trial does support the conclusion that Lopez made the decision to kill G.C. beforehand and with consideration. (*People v. Lee*, *supra*, 51 Cal.4th at p. 636 [a decision to kill is "premeditated" if considered beforehand and "deliberate" if resulting from careful thought and weighing of competing considerations].) By returning a guilty verdict on the charge of attempted murder with a true finding on the premeditation and deliberation enhancement, the jury was persuaded beyond a reasonable doubt.

Lopez suggests there are exculpatory inferences that can be drawn from the evidence, showing that "he may have been acting based on a delusion which made him act rashly and without due deliberation." While Lopez was demonstrating bizarre and impulsive behavior, there is insufficient evidence to conclude that he was unable to premeditate or deliberate, either because he was provoked to kill G.C. based upon his delusion, or because he was in a state of mind that precluded him from forming premeditation and deliberation.

Evidence of the delusion in and of itself is insufficient to conclude that Lopez was unable to premeditate and deliberate because "[t]he mental process necessary for a finding of deliberation and premeditation is not dependent on the motivation for the act." (*Stress, supra,* 205 Cal.App.3d at p. 1270.) Thus, assuming the trial court erred by refusing to instruct the jury on CALCRIM No. 627, Lopez has failed to show prejudice.

## II. Section 654 Issue

At sentencing, the trial court imposed a determinate term on Lopez's conviction for kidnapping (count 2) and an indeterminate term for his conviction for premeditated attempted murder (count 1). The trial court imposed these sentences consecutively reasoning, "With respect to the determina[te] term on the kidnapping, the Court is inclined to impose consecutive term in this matter. The Court, in imposing the consecutive term, while this all was part of the same transaction and occurrence, the actual assault itself, in the Court's view at least, was separate from the kidnap itself." With the exception of counts 1, 2, and 8, all counts were stayed pursuant to section 654.

23.

Lopez asserts that his punishment for kidnapping and attempted murder was prohibited under section 654, because the two crimes were an indivisible course of conduct, with a single criminal intent. In part III of this opinion, *post*, we conclude that resentencing is required based upon the enactment of new legislation. In light of our conclusion, we need not address Lopez's argument that his sentence for kidnapping on count 2 must be stayed under section 654. The parties will have the opportunity to raise this issue on remand.

## III.    Resentencing is Required Based on the Enactment of Recent Legislation

Lopez was sentenced on February 25, 2021. He contends that resentencing is required following the enactment of new legislation that went into effect on January 1, 2022, while the instant appeal was pending: Assembly Bill No. 124, Assembly Bill No. 518, and Assembly Bill No. 567. In a supplemental brief, Lopez further contends that resentencing is required on the firearm enhancement (§ 12022.53, subd. (b)) applied to his premeditated attempted murder conviction, following our Supreme Court's decision in *People v. Tirado* (2022) 12 Cal.5th 688.

The Attorney General agrees that Assembly Bill No. 124 applies retroactively here, and that resentencing is required as to all counts. Consequently, he does not address Lopez's remaining contentions concerning the effect of Assembly Bill Nos. 518 and 567 and *People v. Tirado, supra,* 12 Cal.5th 688 upon Lopez's sentence. We agree as well and will therefore remand this matter back to the lower court for a full resentencing.

Assembly Bill No. 124 sets a presumption that the trial court will impose the lower term under enumerated circumstances, such as where an offender's childhood trauma or youth were contributing factors in the offense. The legislation adds subdivision (b)(6) to section 1170, which states the following:

> "(6) Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:

"(A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.

"(B) The person is a youth, or was a youth as defined under subdivision (b) of [s]ection 1016.7 at the time of the commission of the offense.

"(C) Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking." (§ 1170, subd. (b)(6); Stats. 2021, ch. 695, § 5, eff. Jan. 1, 2022.)

Section 1016.7, subdivision (b), in turn, states: "A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed."

Here, the trial court imposed the upper term on count 1 (attempted murder) and count 2 (kidnapping). Lopez was 23 years old at the time of the offense. He is a "youth" for purposes of section 1170, subdivision (b)(6). He is therefore entitled to the ameliorative benefits of this legislation. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038-1039 [holding Assem. Bill No. 124 applied retroactively to the defendant's case and remanding matter for resentencing].)

## DISPOSITION

Lopez's sentence is vacated and the matter is remanded to the trial court for resentencing. The judgment of conviction is otherwise affirmed.


SMITH, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


DE SANTOS, J.

25.